**Tami J. LEE, Plaintiff–Appellant,**

v.

**RED LOBSTER INNS OF AMERICA, INC., Defendant–Appellee.**

No. 02–5188.

United States Court of Appeals, Sixth Circuit.

Jan. 27, 2004.

Pamela R. O'Dwyer, Randall D. Larramore, Paty, Rymer & Ulin, Chattanooga, TN, for Plaintiff–Appellant.

Devon L. Gosnell, Asst. U.S. Attorney, Ford & Harrison, Tampa, FL, for Defendant–Appellee.

Before NELSON, GIBBONS, and SUTTON, Circuit Judges.

GIBBONS, Circuit Judge.

Plaintiff-appellant Tami Lee ("Lee") brought this appeal for review of a district court decision which granted Defendant-appellee Red Lobster Inns ("Red Lobster") motion to compel arbitration. In February 1998, Lee filed an action under Title VII of the Civil Rights Act of 1964 alleging sex discrimination, harassment, and retaliation. In August 1999, after an evidentiary hearing, the district court

granted Red Lobster's motion to compel arbitration. However, the district court denied Red Lobster's motion to dismiss the suit, and instead stayed the action. On August 24, 2001, the arbitrator denied Lee's claims and found in favor of Red Lobster. On January 7, 2002, the district court granted final judgment in favor of Red Lobster based upon the arbitrator's decision. The dispositive issue for this appeal is whether Lee ever entered into an arbitration agreement with Red Lobster. Because we find that she did not, we reverse the judgment of the district court compelling arbitration and dismissing the suit and remand for further proceedings.

## I.

Lee began working for Red Lobster in 1994. In 1996 she became the culinary manager at the Red Lobster restaurant in Oak Ridge. Tennessee. In June 1997, Red Lobster began introducing to its employees a new procedure for resolving employment disputes. The new dispute resolution procedure ("DRP") involves four steps, the last of which is binding arbitration.[1] Red Lobster announced that the DRP would become effective on October 27, 1997.

Before the DRP's effective date, Red Lobster took several steps to inform its employees of the new procedure. Red Lobster inserted a notice in each employee's paycheck envelope stating that the DRP "goes into effect for all employees October 27, 1997." In July 1997, Red Lobster inserted a clause in the Red Lobster employee booklet stating that "DRP is the exclusive way to address and resolve most workplace problems or concerns that you may have in a prompt, speedy and effective manner." According to the booklet's introduction, the booklet is not an employment contract, but the policies included in the booklet are binding "during the period of [the employee's] employment."

Red Lobster also produced a DRP handbook, poster, video, pamphlet, and information sheet to explain the DRP to its employees. The DRP handbook explains each step of the four-step DRP process and states in its introduction that "the Company has adopted" the DRP "to resolve claims or controversies (as defined in the DRP arising out of an Employee's employment or termination), that an Employee may have against the Company or the Company may have against the Employee." The last sentence of the handbook's introduction states that "neither the Company nor the Employee may litigate such claims against each other in a court."

The video describes the steps of the DRP, explains the reasons why the DRP is (according to the video) better for the employee than litigation, and refers to the DRP as an "attractive alternative" and a "benefit" for the employee. The video also states that if the parties agree to arbitrate, then neither party may go to court. The pamphlet, which is in a question and answer format, extols the benefits of the DRP over litigation in answering the question "Why would I want to use Dispute Resolution instead of going to court?" The pamphlet answers without qualification "No" to the question "Won't I give up some of my legal rights by using mediation

---

1. The first step is "Open Door" which allows the employee to discuss the problem with his or her manager, director, or senior vice president. The second step is "Peer Review" which allows an employee to present the problem to a peer review panel, consisting of two employees and a manager, which then issues a decision. The third step is mediation, where the problem is presented to a neutral mediator who assists the employee and the company in resolving the dispute. The fourth and final step is binding arbitration.

or arbitration?" The information sheet contains short descriptions of each of the four steps of the DRP.

The district court found that Lee was familiar with the Red Lobster employee booklet and the DRP handbook, poster, video, pamphlet, and information sheet. In addition, the district court found that as part of her job she had explained the DRP to new hires as well as existing employees. The record contains a copy of a DRP information sheet that has two signatures at the top, one of which the district court found to be Lee's. The district court found that "Lee's signature on the DRP information sheet shows her knowledge of the policy, but the Court does not conclude that her signature on this sheet, alone, necessarily constituted an acceptance of the policy."

The Red Lobster employee booklet contains a "tear out" sheet, which has a provision manifesting consent to utilize the DRP. The sheet has a line at the bottom for the employee's signature.[2] The district court found that Lee never signed one of these "tear out" sheets above the "Employee" line.

Moreover, the district court also found that "[d]uring the first week of September 1997. Lee told her General Manager, Sherman Minton ("Minton"), that she was not going to agree to the DRP policy." According to the district court, "Minton responded that if Lee did not accept the policy, she would be terminated."

On September 30, 1997, Lee filed a complaint with the Tennessee Human Rights Commission alleging sex discrimination. Lee alleged that Minton, among others, had been harassing her. Red Lobster discharged Minton on October 25, 1997, two days before the DRP's effective date. On November 26, 1997, Red Lobster terminated Lee.

The district court found that between the first week of September 1997 (when she told Minton that she would not agree to the DRP) and her discharge on November 26, 1997, "Lee did not evidence, by word or deed, to anyone in management that she did not accept the DRP." The district court concluded that "she did not evidence her disagreement because she would be terminated if she did." Based on these findings, the district court found that a contract to arbitrate existed between Lee and Red Lobster and compelled arbitration.

## II.

An analysis of whether or not a contract was formed regarding the arbitration agreement is dispositive of this case. Recent cases from this circuit set forth the proper standard of review when the issue is whether the parties entered into an arbitration agreement. In *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306

---

**2.** The body of the "tear out" sheet reads, in full, "I have received a copy of *Welcome to Red Lobster,* the Red Lobster employee handbook. I have read this booklet. I understand it and will comply with the guidelines and policies described in the booklet. I understand that Red Lobster's Dispute Resolution Procedure (DRP) is available to me if I do not agree with a disciplinary or management action taken against me. I agree to submit any eligible disputes I may have to the company's DRP and to abide by the provisions outlined in the process by Red Lobster's Open Door policy and to submit any eligible disputes I may have to the company's Peer Review process. I have read and I understand the company's policy regarding sexual harassment and I agree to follow the complaint procedures set forth in the policy." Under this text, there is a line for the employee to sign, indicating assent. It is unclear whether Red Lobster presented this tear out sheet to all employees or only to new employees.

(6th Cir.2000), we stated that "[w]e review *de novo* a district court's decisions regarding both the existence of a valid arbitration agreement and the arbitrability of a particular dispute." *Id.* at 311; *see also Burden v. Check Into Cash of Ky., LLC,* 267 F.3d 483, 487 (6th Cir.2001) ("This Court reviews *de novo* a district court's ruling on whether to compel arbitration pursuant to the [Federal Arbitration Act]. Under the FAA, a district court's consideration of a motion to compel arbitration is limited to whether the parties entered into a valid agreement to arbitrate and does not reach the merits of the parties' claims."); *and M & C Corp. v. Erwin Behr GMBH & Co.,* 143 F.3d 1033, 1037 (6th Cir.1998) ("A determination of the arbitrability of a dispute is subject to *de novo* review."). This court followed *Floss* in *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646 (6th Cir. 2003), stating "[w]e review *de novo* a district court's determinations regarding the existence of a valid arbitration agreement. As explained *supra,* we review the enforceability of the arbitration agreement according to the applicable state law of contract formation...." *Id.* at 675.

### III.

We find that the DRP did not constitute a contract. Therefore, Lee cannot be forced to arbitrate her Title VII claim because she did not enter into a valid arbitration agreement. The Federal Arbitration Act (FAA) provides that "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Mandatory arbitration agreements covering prospective Title VII claims are enforceable under the FAA. *Morrison v. Circuit City Stores, Inc.,* 317 F.3d at 653 (citing *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), in which a sharply divided Supreme Court held that the FAA generally applies to employment contracts). In determining whether the parties agreed to arbitrate, "ordinary contract principles" apply, *id.* at 668, and the court must "remain[ ] alert to ensure that employers do not defeat the policies of ... Title VII by taking advantage of their superior bargaining position or by overreaching." *Id.* (quoting *Adams v. Philip Morris, Inc.,* 67 F.3d 580, 583 (6th Cir.1995)).[3]

Therefore, a company cannot unilaterally impose a mandatory binding-arbitration policy on an employee without her assent. In other words, the company cannot just adopt a policy that it cannot be sued by its employees and thereby make it so. For an arbitration agreement to be binding, it must be an agreement, not merely a company policy. Moreover, pursuant to the FAA, the agreement must be in writing. 9 U.S.C. § 2.

Red Lobster does not specifically identify the document it considers to be the written arbitration agreement between it-

---

**3.** An arbitration agreement can call for binding or non-binding arbitration. A party waives its right to pursue a claim in court only by agreeing to binding arbitration. *See In re Federated Dept. Stores, Inc.,* 328 F.3d 829, 831 (6th Cir.2003) (discussing "non-binding arbitration"). Also, an arbitration agreement can be pre-dispute or post-dispute. *See Cole v. Burns Int'l Security Servs.,* 105 F.3d 1465, 1472–73 (D.C.Cir.1997) (distinguishing the situation where an employee and employer, in the face of a legal problem, make a mutually voluntary decision to pursue arbitration in lieu of formal litigation from the situation where an employee has been required, as a condition of employment, to forego future access to the courts for statutory employment claims).

self and Lee. The DRP handbook, poster, video, pamphlet, and information sheet all serve to document Red Lobster's company policy, but none resembles a contract containing a written arbitration provision as required by the FAA. The Red Lobster employee booklet states that the policies included within it are binding on an employee during the period of the employee's employment, but it explicitly disclaims being a contract. "An agreement is a manifestation of mutual assent on the part of two or more persons." Restatement (Second) of Contracts § 3 (1981). Lee's assent to arbitrate is not manifested in the DRP handbook, poster, video, pamphlet, information sheet or Red Lobster's employee booklet.

The only document in the record resembling a written agreement to arbitrate is the "tear out" sheet. By signing this sheet above the "Employee" line, an employee "agree[s] to submit any eligible disputes I may have to the company's DRP...." This sheet, however, does not inform the employee that by signing it she is waiving her right to bring a claim in court if submission to the DRP does not render a satisfactory result, i.e., that she is agreeing to binding versus non-binding arbitration.

We need not decide whether Lee, had she signed the tear out sheet, would have been bound to pursue her Title VII claim in federal court because Lee never signed the sheet. Nor did Lee in any other way express her assent to the DRP, either in writing or otherwise. In fact, she explicitly told her boss that she would not agree to the DRP policy.

The district court nevertheless concluded that Lee implicitly agreed to the DRP policy by "only once stat[ing] an unwillingness to be bound by a policy being implemented by her employer." The district court also relied upon its findings that Lee was familiar with the DRP policy and had

helped implement it at the restaurant where she worked. According to the district court, after Lee expressed her disagreement with the DRP to her boss, she "decided to remain silent and keep to herself her subjective belief that she would not be bound by the policy. That way, [Lee] had the best of both worlds. She would still be employed at her job and could utilize the DRP if she wished or ignore it if she wished. Contracts do not work this way."

The flaw in the district court's analysis is that it places the burden on the employee to repeatedly object to a company's unilaterally adopted arbitration policy or risk being found to have agreed to it. This is not how contracts are formed. "The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." Restatement (Second) of Contracts § 69, cmt. a (1981). In addressing an employer's claim that an employee was bound to its unilaterally promulgated arbitration policy because the employee did not positively reject it, the District of Columbia Circuit aptly stated, "[t]he question here is not whether [the employee] effectively rejected what his employer proposed, for he had no obligation even to respond to [his employer's] proposal. The issue is whether [the employee] did something to indicate that he intended to enter into an agreement with [his employer] so as to bind himself to pursue his statutory claims of employment in arbitration." *Bailey v. Federal Nat'l Mortg. Assn.*, 209 F.3d 740, 745–46 (D.C.Cir.2000).

The district court, acknowledging that Lee never expressly agreed to arbitrate, cites Tennessee law to the effect that Lee entered into an "implied in fact contract" to arbitrate. "Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and

the common understanding of men, show a mutual intention to contract. Such an agreement may result as a legal inference from the facts and circumstances of the case." *Weatherly v. American Agric. Chem. Co.*, 16 Tenn.App. 613, 65 S.W.2d 592, 598 (Tenn.Ct.App.1933). There are two main problems with the district court's reliance on an implied-in-fact contractual theory in this case. First, Lee and Red Lobster had not established any course of dealing upon which it was reasonable for Red Lobster to assume that Lee's actions or inactions manifested acceptance of its offer to enter into an arbitration agreement. Second, the Supreme Court of Tennessee has stated in no uncertain terms that "[a] promise cannot be implied in fact in the face of a declaration to the contrary by the party to be charged." *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587, 590 (Tenn.1976). Here, Lee told her supervisor that she would not agree to arbitrate. Lee had no legal duty to repeat herself or to express her unwillingness to arbitrate to an official higher than her direct supervisor.

Red Lobster leans heavily on the district court's factual finding that "Lee understood accepting the DRP policy was a[sic] considered to be a condition of her continued employment." The district court based this conclusion on its finding that Minton told Lee that if she did not accept the policy, she would be terminated. Therefore, Red Lobster argues, Lee accepted the DRP by not quitting her job before the DRP became effective. Lee,

however, had no obligation to quit her job just because Minton predicted that she would be fired if she did not agree to the DRP. None of the various DRP materials distributed by Red Lobster instructed the employees that by continuing their employment they were manifesting their agreement with the DRP.[4]

In considering a similar situation, the Ninth Circuit persuasively reasoned:

> Nothing in either the acknowledgment form or the Handbook itself put [the employee] on notice that by not quitting his job he was somehow entering into an agreement to waive a specific statutory remedy afforded him by a civil rights statute. Any bargain to waive the right to a judicial forum for civil rights claims, including those covered by the ADA, in exchange for employment or continued employment must at the least be express: the choice must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question. That did not occur in the case before us.

*Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir.1997) (holding that the unilateral promulgation of an arbitration policy by an employer does not constitute an arbitration agreement).

The District of Columbia Circuit has also considered a similar situation, and it questioned "whether an employer may impose a condition of employment requiring a current employee to use arbitration before seeking to litigate statutory employment discrimination claims for no

---

**4.** The case at bar is distinguishable, of course, from cases in which employer-distributed materials told employees that their continuing to work would constitute acceptance of the employer's dispute resolution plan. See *e.g., Tinder v. Pinkerton Security*, 305 F.3d 728, 731–32 (7th Cir.2002). In those cases, an employee's remaining at work past the effective date of the policy was properly construed

as manifestation of an agreement to be bound. See *id.* at 734; *Raasch v. NCR Corp.*, 254 F.Supp.2d 847, 866–67 (S.D.Ohio 2003); *Gutman v. Baldwin Corp.*, No. 02–CV–7971, 2002 WL 32107938, at *4 (E.D.Pa. Nov.22, 2002); *Gonzalez v. Toscorp Inc.*, No. 97–CIV–8158, 1999 WL 595632, at *2 (S.D.N.Y. Aug.5, 1999).

consideration save the employee's continued employment." *Bailey*, 209 F.3d at 741. We need not resolve this thorny question because Red Lobster never offered to continue Lee's employment in exchange for her promise to waive her right to bring a Title VII action in federal court.

## IV.

For these reasons, the ruling of the district court compelling arbitration and dismissing Lee's suit is hereby reversed. We remand for further proceedings consistent with this opinion.