RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0058p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

SEVIER COUNTY SCHOOLS FEDERAL CREDIT UNION;
SUSANNE MUNSON; GEOFFREY WOLPERT; CHARLES
MCGAHA; CHARLENE MCGAHA; ROBIN NICHOLS;
GREGORY NICHOLS; REX NICHOLS; SARAH MORRISON,

　　　　　*Plaintiffs-Appellants*,

　　　　　*v.*

BRANCH BANKING AND TRUST COMPANY,

　　　　　*Defendant-Appellee*.

┐
│
│
│
│
> No. 20-5174
│
│
│
┘

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:19-cv-00138—Travis Randall McDonough, District Judge.

Argued: December 2, 2020

Decided and Filed: March 5, 2021

Before: MOORE, GILMAN, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Gregory Brown, LOWE YEAGER & BROWN PLLC, Knoxville, Tennessee, for Appellants. John S. Hicks, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWTIZ, P.C., Nashville, Tennessee, for Appellee. **ON BRIEF:** Gregory Brown, Christopher Field, W. Scott Hickerson, LOWE YEAGER & BROWN PLLC, Knoxville, Tennessee, Donald K. Vowell, THE VOWELL LAW FIRM, Knoxville, Tennessee, for Appellants. John S. Hicks, Christopher E. Thorsen, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWTIZ, P.C., Nashville, Tennessee, Nicholas W. Diegel, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWTIZ, P.C., Knoxville, Tennessee, for Appellee.

　　　GILMAN, J., delivered the opinion of the court in which MOORE, J., joined. GRIFFIN, J. (pp. 16–25), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  This is a putative class action brought by the Sevier County Schools Federal Credit Union and other account holders (the Plaintiffs) against the Branch Banking & Trust Company (BB&T).  The Plaintiffs allege that BB&T failed to honor a commitment made by one of its predecessors, the First National Bank of Gatlinburg (FNB), promising that the annual interest rate on certain high-interest Money Market Investment Accounts was guaranteed to "never fall below 6.50%."

The Plaintiffs might well prevail on the merits of their dispute with BB&T because, on the surface at least, the bank is trying to wriggle out of a commitment made years ago to these Plaintiffs by FNB.  But the issue presently before us is not the merits of this dispute; instead, we must decide whether the merits should be resolved by a court or by an arbitrator.  This is because BB&T's Bank Services Agreement (BSA) specifies that all disputes between the parties "shall be determined by arbitration."

BB&T moved to dismiss the complaint and to compel arbitration, which the district court granted.  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

**I. BACKGROUND**

**A.     Factual background**

**1.      *The 6.5% interest-rate guarantee***

In 1989, the Plaintiffs opened Money Market Investment Accounts (MMIAs) with FNB. FNB guaranteed that the MMIAs' annual rate of interest would "never fall below 6.5%."  The original contract was two pages in length, did not include any provision limiting an account holder's right to enforce the agreement in court, and included the following change-of-terms provision:

> Changes in the terms of this agreement may be made by the financial institution from time to time and shall become effective upon the earlier of (a) the expiration of a thirty-day period of posting of such changes in the financial institution, or (b) the making or delivery of notice thereof to the depositor by the notice in the depositor's monthly statement for one month.

### 2.      *Mergers and amendments*

In March 1997, FNB merged with BankFirst of Tennessee (BankFirst). BankFirst continued paying 6.5% annual interest on the MMIAs for the next four years. In July 2001, BankFirst merged with BB&T. BB&T was aware of the MMIAs and its obligations to former MMIA-holders because, three days after the merger, BB&T converted those accounts to "Money Rate Savings Accounts" (MRSAs). The conversion apparently involved nothing more than a change of name.

Upon acquiring BankFirst in 2001, BB&T claims that it sent a BSA to each account holder. The 2001 BSA stated that, by continuing to maintain an account with BB&T, the account holders agreed to the 2001 BSA's terms. Among those terms were provisions that (1) the 2001 BSA could be amended (as it later was in 2004 and again in 2017), (2) amendments would be promulgated by written notice to the account holders, and (3) continued use of an account after receipt of notice constituted acceptance of the amendment. The 2001 BSA also included the following arbitration provision: "You and [BB&T] each have the option of requiring that any dispute or controversy concerning your account be decided by binding arbitration." This provision would have made the account holders responsible for half the initial costs of arbitration, while also allowing an arbitrator to award "the costs of arbitration or attorneys' fees as part of the decision."

BB&T amended the BSA in 2004. The 2004 BSA, among other terms, added a class-action waiver and abolished all "special, incidental, consequential, punitive or indirect damages, including without limitation loss of profits."

In April 2017, BB&T once again amended the BSA. This amendment (the 2017 Amendment) made massive changes to the BSA, including an amendment to the arbitration provision. The provision began as follows:

IT IS IMPORTANT THAT YOU READ THIS ARBITRATION PROVISION CAREFULLY. IT PROVIDES THAT YOU MAY BE REQUIRED TO SETTLE A CLAIM OR DISPUTE THROUGH ARBITRATION EVEN IF YOU PREFER TO LITIGATE SUCH CLAIMS IN COURT. YOU ARE WAIVING RIGHTS YOU MAY HAVE TO LITIGATE THE CLAIMS IN A COURT OR BEFORE A JURY. YOU ARE WAIVING YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT, CLASS ACTION ARBITRATION, OR OTHER REPRESENTATIVE ACTION WITH RESPECT TO SUCH CLAIMS.

It continued:

Any dispute, claim, controversy or cause of action, that is filed in any court and that arises out of or relates to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope of applicability of this agreement to arbitrate, shall be determined by arbitration before one arbitrator at a location mutually agreed upon in the state where your account is maintained, or as may be otherwise required under the JAMS Minimum Consumer Standards, which is incorporated by reference herein . . . . If a party elects arbitration, it may be conducted as an individual action only. This means that even if a demand for a class action lawsuit, class arbitration, or other representative action (including a private attorney general action) is filed, the matter will be subject to individual arbitration. Either party may bring a summary or expedited motion to compel arbitration or to stay the applicable litigation of a dispute in any court. Such motion may be brought at any time, and the failure to initiate or request arbitration at the beginning of litigation shall not be construed as a waiver of the right to arbitration.

The reference to "JAMS" in the above paragraph is directed to the organization formerly known as Judicial Arbitration Mediation Services, Inc. *See* Cal. Comm. Int. Dev. L. & Prac. § 21:120 (2020 ed.). It is a network of former judges, legal academics, and professional mediators with a background in Alternative Dispute Resolution (ADR). *Id*.

BB&T allegedly sent notice of the 2017 Amendment to each customer. In the notice was the following reference to the amendment of the arbitration provision: "The following paragraph replaces both the second and third paragraphs of the ARBITRATION AGREEMENT section of your [BSA]." Also in the notice was a statement that the account holders and BB&T were participating in transactions involving interstate commerce and were therefore "governed by the provisions of the Federal Arbitration Act . . . and not by any state law concerning arbitration."

As with the prior changes, the 2017 Amendment provided that continued use of the account after receiving notice constituted acceptance of the changes. All of the Plaintiffs maintained their MRSAs following the 2017 Amendment.

### 3. *BB&T decides to lower the interest rate*

From its initial acquisition of BankFirst in July 2001 until January 2018, BB&T—like BankFirst—respected the 6.5% interest rate for the former MMIAs. In January 2018, however, the Plaintiffs were notified that the annual percentage rate applicable to their accounts would soon drop by more than five percentage points—from 6.5% to 1.05%—in March 2018. The Plaintiffs were also informed that, starting in April 2019, the rates would "automatically adjust to BB&T's standard balance tiers, as well as to the current standard variable rate of the interest and APY [annual percentage yield]." For accounts with balances of $1,000 and up, these "standard balance tiers" reflected the industry's then-current interest rate—only 0.01% per year.

## B. Procedural background

In March 2019, the Plaintiffs filed an action in the Circuit Court for Sevier County, Tennessee on behalf of themselves and all other similarly situated persons. They argued that BB&T is liable for breach of contract due to its actions in lowering the guaranteed interest rate. BB&T removed the lawsuit to federal court in a timely manner. Soon thereafter, the bank filed a motion to dismiss and to compel arbitration, which the district court granted. The district court had diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

## A. Standard of review and applicable law

We review de novo both the existence and validity of an agreement to arbitrate. *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 376 (6th Cir. 2005). Such review is conducted pursuant to "ordinary state-law principles that govern the formation of contracts." *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 450 (6th Cir. 2005) (holding that the question of whether an arbitration provision is valid is one of state contract law). Here, the relevant law is

that of Tennessee. *Williams v. Smith*, 465 S.W. 3d 150, 153 (Tenn. Ct. App. 2014) (noting that Tennessee follows the rule of *lex loci contractus*, which creates a presumption that a contract is governed by the law of the jurisdiction where it was executed); *see also Smith v. Servicemaster*, 2009 WL 1457143, at \*3 (M.D. Tenn. May 22, 2009) ("Because arbitration agreements are fundamentally contracts, the enforceability of a purported agreement to arbitrate is evaluated according to the applicable state law of contract formation.").

An arbitration agreement may be "voided for the same reasons for which any contract may be invalidated under [Tennessee] law." *Hudson v. BAH Shoney's Corp.*, 263 F. Supp. 3d 661, 667 (M.D. Tenn. 2017). Before allowing a case to be arbitrated, a court must therefore examine whether the contract is valid under the law of the state where it was executed. *Cooper v. MRM Investment Co.*, 367 F.3d 493, 499 (6th Cir. 2004).

The Federal Arbitration Act (FAA) makes this concept explicit in its so-called "savings clause," which provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added). So despite "a national policy favoring arbitration," *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984), an arbitration agreement will not be enforced if the parties never agreed to arbitrate in the first place. *Capps v. Adams Wholesale Co., Inc.*, 2015 WL 2445970, at \*3 (Tenn. Ct. App. 2015) (affirming the trial court's denial of a motion to compel arbitration because mutual assent was found lacking).

**B.      Because there was no mutual assent, the 2001 BSA and its subsequent amendments are invalid to the extent that they materially changed the terms of the original agreement**

In Tennessee and generally, two essential elements in the formation of a valid contract are (1) consideration and (2) mutual assent. *Staubach Retail Servs.-Southeast, LLC v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 524 (Tenn. 2005) (A contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, [must be] free from fraud or undue influence, [must] not [be] against public policy and [must be] sufficiently definite to be enforced.") (citation omitted). The Plaintiffs argue that both

consideration and mutual assent are lacking with regard to the arbitration provision. They are wrong about consideration, but are correct as to the lack of mutual assent.

### 1.    *Consideration*

The Plaintiffs' argument that the BSAs are not binding because of a lack of consideration regarding their agreement to arbitrate is unavailing. "Mutuality of promises is 'ample' consideration for a contract" in Tennessee. *Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d 351, 358 (Tenn. Ct. App. 2001) (quoting *Rodgers v. Southern Newspapers, Inc.*, 379 S.W.2d 797, 800, (Tenn. 1964)). Both state and federal courts have consistently found that consideration exists so long as the arbitration agreement binds both parties. *Id.* ("A mutual promise in itself would constitute a sufficient consideration.") (citation and internal quotation marks omitted); *Hudson*, 263 F. Supp. 3d at 671 (holding that a mutual promise alone constituted consideration). Because the arbitration provision within the 2017 Amendment binds both the Plaintiffs and BB&T, there is adequate consideration for the provision.

### 2.    *Mutual assent*

What is lacking in this case is the Plaintiffs' consent to the arbitration provision in the BSAs. This issue is controlled by Tennessee law.

### a.    *The district court's analysis*

A meeting of the minds sufficient to give rise to mutual assent "is determined by assessing the parties' manifestations according to an objective standard." *Wofford v. M.J. Edwards & Sons Funeral Home Inc*, 490 S.W.3d 800, 810 (Tenn. Ct. App. 2015) (citations and internal quotation marks omitted). Whether any given action "constitutes an acceptance must be assessed in terms of whether it would lead a reasonable person to conclude that the offer has been accepted." *Rode Oil Co. v. Lamar Advert. Co.*, 2008 WL 4367300, at *8 (Tenn. Ct. App. Sept. 18, 2008) (citation and internal quotation marks omitted). Tennessee courts are consistent in holding that, even though an action as explicit as a signature is not necessary for mutual assent, mutual assent should not "be inferred from . . . unilateral acts . . . or by an ambiguous course of dealing between the parties from which different inferences regarding the terms of the

contract may be drawn." *Burton v. Warren Farmers Co-op*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002).

The issue in this case is whether, after agreeing to be bound by the initial MMIA agreement, the Plaintiffs assented to the new terms set out in the BSAs from BB&T. As the district court noted, if the Plaintiffs did not explicitly assent to these new terms, then "the question becomes whether Plaintiffs are otherwise bound to the [BSA] and its amendments by virtue of their continued use of the accounts." *Sevier Cnty. Schs. Fed. Credit Union v. Branch Banking & Trust Co.,* 432 F. Supp. 3d 735, 744 (E.D. Tenn. 2020).

In evaluating this question, the district court agreed with the Plaintiffs that silence or inaction does not automatically constitute acceptance of an offer; however, it continued, silence or inaction can constitute acceptance when the circumstances "indicate that such an inference of assent is warranted." *Id*. at 744 (quoting *Westfall v. Brentwood Servs. Grp.*, *Inc.*, 2000 WL 17121659, at *5 (Tenn. Ct. App. Nov. 17, 2000)). The district court ultimately agreed with BB&T's argument that the Plaintiffs did not merely remain silent here, but took action sufficient to manifest assent by continuing to maintain their accounts with BB&T. *Id*. at 748.

Although the district court found "no Tennessee or related federal case directly address[ing] the circumstances at issue" here, *id*. at 745, it cited employment and subscription-service cases where courts have found that continuing with a particular course of action suggests the existence of mutual assent as a matter of law, even if not of reality. *Id.* at 745–48. The district court concluded that the balance of analogous cases suggested that mutual assent existed. *Id*. at 748 ("Although these Tennessee cases do not directly control the resolution of the case at issue, they counsel toward finding that Plaintiffs assented to be bound by the arbitration agreement.").

In agreeing with the district court's conclusion, the dissent cites *Seawright v. American General Financial Services, Inc.,* 507 F.3d 967 (6th Cir. 2007), for the proposition that this court has "recognized that identical conduct in similar contexts constitutes acceptance under Tennessee law." (Dissent, p. 17) We respectfully disagree. *Seawright* involved an at-will employee who continued working after her employer instituted an arbitration provision, as

opposed to BB&T's contractual obligations in question here. The context of the Plaintiffs' circumstances in the present case, in other words, is far from "identical" to that of the employee in *Seawright*.

Even the district court distinguished *Seawright* as one of the employment cases that does not directly address the issue pending before us. *See Sevier*, 432 F. Supp. at 745. But the district court did find three factors especially salient. First, the Plaintiffs never objected, over the course of almost two decades, to the arbitration provision. *Id.* at 748. Second, even though the Plaintiffs never signed any of the agreements or otherwise assented in writing, the BSAs explicitly stated that continuing to hold accounts with BB&T would function as an acceptance of their terms. *Id.* The final factor the court noted was that "individuals and organizations who maintain accounts at banks would reasonably expect their relationship with the bank to be governed by some sort of agreement." *Id.*

There are several problems with the district court's analysis. First, the record is unclear as to whether the correct procedure was followed. *See id*. at 744 (acknowledging that "[f]rom the Court's own review of the record, it remains unclear whether these documents were distributed in a manner consistent with the MMIA Agreement"). As for the second point—the BSAs' language that merely maintaining the accounts was deemed acceptance—this court addressed the issue in *Lee v. Red Lobster Inns of America, Inc.*, 92 F. App'x 158 (6th Cir. 2004), reasoning that "[t]he flaw in the district court's analysis is that it places the burden on the [consumers] to . . . object to a company's unilaterally adopted arbitration policy or risk being found to have agreed to it. This is not how contracts are formed." *Id*. at 162. "The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* (quoting Restatement (Second) of Contracts § 69, cmt. a (1981)).

Third, whether "individuals and organizations who maintain accounts at banks would reasonably expect their relationship with the bank to be governed by some sort of agreement," *Sevier*, 432 F. Supp. 3d at 748, is not material. The proper question is whether, upon assenting to the original two-page MMIA agreement, such individuals and organizations would reasonably expect their relationship to be governed—more than a decade later—by new provisions

unilaterally added by a successor bank to such an extent that the BSA ultimately contained terms that materially changed the Plaintiffs' rights and obligations under the original agreement. *See Johnson v. Welch*, 2004 WL 239756, at \*8 (Tenn. Ct. App. 2004) (noting that "in construing contracts, courts must look at the language and the parties' intent and impose a construction that is fair and reasonable," and that "[r]easonableness must be viewed in light of the parties' situation *at the time of the making of the agreement* as well as at the time performance becomes due") (emphasis added).

This exposes the major flaw in the district court's analysis—its failure to address whether the BSAs are invalid by virtue of exceeding the scope of the original change-of-terms provision. BB&T relies on this provision in the original two-page MMIA agreement between FNB and the Plaintiffs to impose new terms contained in an agreement that ultimately stretched to 33 pages. When a party makes a unilateral change of this magnitude, and especially where that party has vastly greater bargaining power, a court should carefully examine whether the proposed changes are (1) reasonable, and (2) not in violation of the implied covenant of good faith and fair dealing. *See Hathaway v. Hathaway*, 98 S.W.3d 675, 678-79 (Tenn. Ct. App. 2002) ("[A] qualifying word which must be read into every contract is the word 'reasonable' or its equivalent 'reasonably.'") (quoting *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993)); *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) ("[T]here is implied in every contract a duty of good faith and fair dealing in its performance and enforcement . . . .") (citation omitted).

The BSAs in question are clearly contracts of adhesion. *See Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996) (defining a contract of adhesion as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it basis'" that affords the consumer with no "realistic opportunity to bargain" and, critically, where the consumer "cannot obtain the desired product or service except by acquiescing to the form of the contract") (citations omitted). This conclusion is bolstered by the fact that other courts analyzing BB&T's BSAs have concluded that they were contracts of adhesion. *See, e.g.*, *In re Checking Account Overdraft Litig. MDL No. 2036*, 685 F.3d 1269, 1280 n.13 (11th Cir. 2012) (finding that BB&T's BSA was a contract of adhesion under South Carolina law).

The change-of-terms provision in the original MMIA agreement stated that "[c]hanges in the terms of this agreement may be made by the financial institution from time to time" so long as they were posted in the institution or mailed in a monthly statement. Armed with this simple provision, BB&T argues that even fundamental changes to the original contract are valid, regardless of their magnitude or character. The district court implicitly accepted this argument by concluding that the 2001 BSA and its later amendments in 2004 and 2017 were valid despite the expansion of the original 2-page document into a BSA 33 pages in length.

In its analysis, however, the district court failed to meaningfully consider the Plaintiffs' argument that BB&T's addition of the arbitration provision as part of this expansion was inconsistent with the substance of the original change-of-terms provision. Its total analysis on this point consisted of a two-sentence footnote that failed to cite to any authority. *See Sevier*, 432 F. Supp. 3d at 744 n. 4 ("Plaintiffs also contend that the addition of an arbitration agreement was not contemplated by the language of the MMIA Agreement. However, because the Court finds that BB&T did not follow the procedures for effectuating an amendment to the MMIA Agreement, it need not consider the substantive reasonableness of the change.") (citation omitted).

The Plaintiffs in their briefing do not contest "that [BB&T] could make *reasonable changes* to the banking agreement pursuant to [the MMIA's change-of-terms] provision." (Emphasis in original.) They instead properly assert that BB&T's discretion under the original change-of-terms provision to amend the terms is not unlimited, but is subject to two requirements: (1) that any changes be reasonable, and (2) that BB&T exercise its discretion to make such changes in a manner consistent with the implied covenant of good faith and fair dealing.

### b.     *The reasonableness requirement*

Per the reasonableness requirement, the Plaintiffs argue that any changes must be limited to changing terms that were included in the original agreement. And because the original agreement with FNB made no mention of dispute resolution, much less of limiting the Plaintiffs' right to go to court, they contend that BB&T cannot force the Plaintiffs to arbitrate.

The Plaintiffs principally rely on *Badie v. Bank of America*, 67 Cal. App. 4th 779 (Cal. Ct. App. 1998), a seminal case on this point with facts materially indistinguishable from those present here, in support of their argument.

In *Badie*, the California Court of Appeal found that a similar change-in-terms provision did not give the bank the right to unilaterally add an arbitration provision to the account holder's original agreement. The court noted that, as here, the proposed change was attempted via notice, and that "the method and forum for dispute resolution—a matter . . . collateral to that relationship—is not discussed at all" in the original agreement. *Id*. at 800. Moreover, the court concluded that "there [was] nothing about the original terms that would have alerted a customer to the possibility that the Bank might one day in the future invoke the change of terms provision to add a clause that would allow it to *impose* ADR on the customer." *Id*. at 801 (emphasis in original).

The *Badie* court explained that a bank does not have a unilateral right "carte blanche to make any kind of change whatsoever so long as a specific procedure is followed." *Id*. at 791. The change must instead be "a modification whose general subject matter was anticipated when the contract was entered into." *Id*. As a result, the court said that it could not "assume . . . that notice alone, without some affirmative evidence of the depositor's consent, could bind a depositor to a significant change regarding matters that were not addressed in the original contract at all." *Id*. at 793. *Badie's* logic is even more applicable here, where the record is unclear as to whether BB&T made the changes to the BSAs in a manner consistent with the original change-of-terms provision, or if the Plaintiffs even received the 2001 BSA or its 2004 and 2017 amendments. *See Sevier*, 432 F. Supp. 3d at 744.

BB&T's argument that we should disregard *Badie* is unpersuasive because the bank relies on a false premise—that *Badie* is "unorthodox and rarely followed by other states." To the contrary, other courts confronting circumstances analogous to those here—an attempt by the dominant party to unilaterally and materially diminish its customers' rights under a contract of adhesion through a change-of-terms provision—have declined to apply *Badie* only when the customers had a "meaningful opportunity" to opt out of the arbitration provision. *See, e.g.*, *Valle*

*v. ATM Nat., LLC*, 2015 WL 413449, at *4 (S.D.N.Y. Jan. 30, 2015) (noting that the "primary concern of *Badie* and related cases in springing unexpected terms on the consumer" is alleviated where consumers have "ample opportunity" to opt out of arbitration); *Howard v. Ferrellgas Partners*, *L.P.*, 92 F. Supp. 3d 1115, 1138 (D. Kan. 2015) (applying Kansas law, and approvingly referencing *Valle*'s "meaningful opportunity to opt out" requirement) (internal quotation marks omitted).

Still other courts, moreover, have applied *Badie* even where the plaintiffs *could opt out* of the new arbitration provision. *See, e.g., Follman v. World Fin. Network Nat'l Bank*, 721 F. Supp. 2d 158, 165 (E.D.N.Y. 2010) (interpreting Ohio law in declining to enforce an added arbitration provision despite the inclusion of an opt-out clause); *Stone v. Golden Wexler & Sarnese, P.C.*, 341 F. Supp. 2d 189, 198 (E.D.N.Y. 2004) (interpreting Virginia law to find an arbitration provision unenforceable, and noting that several "courts have followed the *Badie* reasoning even when [the original agreement] allowed additions and [the consumers] were given an opportunity to opt out from the proposed arbitration clause").

Based on the circumstances in the case before us, we are persuaded that the Tennessee Supreme Court would follow the logic of *Badie*. The first reason that it would do so is because BB&T provided the Plaintiffs with no opt-out opportunity. This left the Plaintiffs with no choice other than to acquiesce to the new arbitration provision or to close their high-yield savings accounts. And closing their accounts is a totally unreasonable option because doing so would obviate the very essence of the Plaintiffs' accounts—the promise of a perpetual 6.5% annual interest rate.

We can take judicial notice that nowhere near such a rate is currently available anywhere else. *See* Investopedia, "Best High-Yield Savings Accounts" (March 4, 2021), https://www.investopedia.com/best-high-yield-savings-accounts-4770633 (listing the best high-yield savings account rates available, all of which show banks advertising rates of less than 1.00%); Fed. R. Evid. 201(b)(1) & (2) ("The court may judicially notice a fact that is not subject to reasonable dispute . . . .").

### c.          *The implied covenant of good faith and fair dealing*

This leads to the second reason why we are persuaded that the Tennessee Supreme Court would follow the logic of *Badie*; *i.e.*, that the purported imposition of the arbitration provision would violate the common law's implied covenant of good faith and fair dealing. BB&T did not act reasonably when it added the arbitration provision years after the Plaintiffs' accounts were established by FNB, thus violating the implied covenant of good faith and fair dealing in its attempt to use the original change-of-terms provision to force the Plaintiffs to arbitrate.

The following analysis in *Badie* is especially pertinent in applying the implied covenant to the facts here:

> Where, as in this case, a party has the unilateral right to change the terms of a contract, it does not act in an "objectively reasonable" manner when it attempts to "recapture" a foregone opportunity by adding an entirely new term which has no bearing on any subject . . . in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into. *That is particularly true where the new term deprives the other party of the right to a jury trial and the right to select a judicial forum for dispute resolution.*

*Badie*, 67 Cal. App. 4th at 796 (emphasis added) (internal citation omitted). We have every reason to believe that the Tennessee Supreme Court would fully concur in this analysis.

One final point: the dissent's contrary conclusion is primarily based on its assertion that the Plaintiffs' inaction by continuing to maintain their accounts should be deemed an acceptance of BB&T's unilaterally imposed arbitration provision. This assertion, however, is not only inconsistent with Tennessee law, *see Johnson v. Welch*, 2004 WL 239756, at *8 (Tenn. Ct. App. 2004), but is completely neutralized by BB&T's own inaction for sixteen and a half years. For this long period of time (between July 2001 and January 2018), BB&T continued to honor the 6.5% interest-rate guarantee. The Plaintiffs were thus lulled into not giving a thought to the unilateral addition of the arbitration provision in the BSA. Why, after all, would they have any reason to believe that BB&T might someday attempt to end a guarantee that had been honored by BB&T ever since it first acquired the accounts in 2001? This is a classic case of the pot calling the kettle black, and is the antithesis of good faith and fair dealing.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the district court's grant of BB&T's motion to dismiss and compel arbitration, and **REMAND** the case for further proceedings consistent with this opinion.

---

## **DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.

Because plaintiffs assented to this arbitration agreement, and because it is neither adhesive nor unconscionable, I respectfully dissent. I would affirm the district court's judgment.

I.

First, plaintiffs agreed to arbitrate these claims. In Tennessee, assent does not need to be explicit and may instead be "manifested, in whole or in part, by the parties' . . . actions or inactions." *Burton v. Warren Farmers Co-op*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). Action or inaction constitutes acceptance if it "would lead a reasonable person to conclude that the offer has been accepted." *Aqua-Chem, Inc. v. D & H Mach. Serv., Inc.*, No. E2015-01818-COA-R3-CV, 2016 WL 6078566, at *4 (Tenn. Ct. App. Oct. 17, 2016) (quotation omitted). Although assent may not "be inferred from the unilateral acts of one party or by an ambiguous course of dealing between the parties," *Burton*, 129 S.W.3d at 521, "[a]cting in a matter that indicates acceptance of a contract is generally deemed to be acceptance." *Aqua-Chem*, 2016 WL 6078566, at *4 (citation omitted).

Here, it is undisputed that when Branch Banking acquired BankFirst in 2001, it provided each plaintiff with a welcome letter that included a copy of the bank services agreement that would govern their accounts from that point forward.[1] This agreement included an arbitration

---

[1]Branch Banking offered an affidavit of one of its Vice Presidents to substantiate the steps it took to inform its new customers of the bank services agreement and subsequent amendments. Although plaintiffs challenge the admissibility of this affidavit, they offer no proof of their own to contradict its substance, nor do they allege that they did not receive the bank services agreement or any amendment. The district court considered, and rejected, the same admissibility arguments that plaintiffs raise on appeal. *Sevier Cty. Schs. Fed. Credit Union v. Branch Banking & Tr., Co.*, 432 F. Supp. 3d 735, 739 n.1 (E.D. Tenn. 2020). I see no abuse of discretion on the admissibility of this affidavit. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). And because there is no dispute of fact, it was appropriate for the district court to decide the question of contract formation as a matter of law. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (issues that concern contract formation are "generally for courts to decide.") The district court also appropriately limited its analysis to whether a valid agreement had been formed, and left questions of arbitrability for the arbitrator, as provided for in the agreement. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

clause and stated that "when you . . . maintain a deposit account with the Bank, you are agreeing to the terms of this Bank Services Agreement," which could be "amended from time to time by the Bank," and that continued use of the account following notice of an amendment constituted acceptance of that amendment. In April 2017, Branch Banking amended the agreement to include the arbitration clause that applies to the parties' current dispute. The 2017 amendment reiterated that "[c]ontinued use of your account following a notice constitutes your acceptance of our changes." Plaintiffs never objected to any agreement or amendment and continued to maintain their accounts at Branch Banking.

In short, Branch Banking repeatedly and unambiguously informed plaintiffs that continued maintenance of their bank accounts would constitute acceptance of the bank services agreement (and by extension, the arbitration agreement). After receiving this notice, plaintiffs continued to maintain their accounts with Branch Banking. We have recognized that identical conduct in similar contexts constitutes acceptance under Tennessee law. *See, e.g.*, *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 970 (6th Cir. 2007) ("We hold that [plaintiff's] knowing continuation of employment after the effective date of the arbitration program constituted acceptance of a valid and enforceable contract to arbitrate.") The same result should follow here.

In reaching a different conclusion, the majority cites our unpublished case *Lee v. Red Lobster Inns of America, Inc.*, 92 F. App'x 158 (6th Cir. 2004). That non-precedential decision is inapplicable here for two reasons. First, the agreement in *Lee* did not instruct the offeree that continuing their course of conduct (in that case, working at a restaurant) would constitute acceptance of the agreement. *Id*. at 163. In fact, we explicitly distinguished *Lee* from "cases in which employer-distributed materials told employees that their continuing to work would constitute acceptance of the employer's dispute resolution plan." *Id*. at 163 n.4. In those cases, "an employee's remaining at work past the effective date of the policy was properly construed as manifestation of an agreement to be bound." *Id*. So too here; by continuing to maintain their accounts at Branch Banking, plaintiffs objectively manifested their consent to arbitration. Second, the *Lee* plaintiff explicitly informed her employer that she would not agree to arbitrate. *Id*. at 162. In contrast, plaintiffs here did not object to the arbitration agreement at any point in

nearly two decades since it was first introduced.  Under the circumstances of *Lee*, no reasonable person could have concluded that the offer had been accepted.  The facts of this case, however, compel the opposite conclusion.

The majority also unduly focuses on what it calls "the major flaw in the district court's analysis," its failure to consider "whether the BSAs are invalid by virtue of exceeding the scope of the original change-of-terms provision."  But Tennessee law allows a written contract to be modified "in accordance with some provision thereof authorizing a change upon specific terms and conditions," *or* "by consent of the parties."  *Cronbach v. Aetna Life Ins. Co.*, 284 S.W. 72, 73 (Tenn. 1926).  Even if Branch Banking's bank services agreement (and included arbitration agreement) exceeded the scope of the original agreement, the new agreement is still effective in its own right because plaintiffs consented to its terms when they continued to maintain their accounts at the bank.

Finally, the majority condemns Branch Banking's conduct as "the antithesis of good faith and fair dealing."  But Branch Banking merely offered terms that plaintiffs accepted.  The bank then met its obligations to plaintiffs for sixteen-and-a-half years, paying the 6.5% interest rate until the events that began this litigation.  During that time, Branch Banking had every reason to believe that plaintiffs had consented to the arbitration agreement and subsequent amendments.  Moreover, the merits of the bank's alleged breach are not before us.  Rather, the only issue presented is whether plaintiffs must perform *their* contractual obligation to arbitrate these claims.  Thus, for the purposes of this appeal, it is plaintiffs who are "trying to wriggle out of a commitment made years ago," not Branch Banking.

## II.

Second, the arbitration agreement is neither adhesive nor unconscionable.

## A.

To be adhesive under Tennessee law, a contract must be offered (1) in a standardized form; (2) on a "take it or leave it" basis; (3) without a realistic opportunity to bargain; and (4) under such circumstances that the consumer cannot obtain the desired product except by

acquiescing to the form of the contract. *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996). Plaintiffs, as the parties resisting arbitration, bear the burden of proving the adhesiveness of the arbitration agreement. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (1983).

Nothing suggests that plaintiffs lacked a realistic opportunity to bargain when confronted with the proposed arbitration agreement. As the district court noted, plaintiffs "made no attempt at bargaining or challenging the [arbitration] provisions" in the nearly two decades since these provisions were first introduced into their services agreements, and they do not allege that they were somehow prevented from bargaining with Branch Banking.

This alone is fatal to plaintiffs' claims of adhesiveness. But even if plaintiffs had established this element, they have failed to show that they could not obtain "the desired product" except by acquiescing to the arbitration agreement. Plaintiffs characterize the "desired product or service" as a bank account with a 6.5% interest rate. In my view, however, the interest rate is better described as one desired term of the service or product, not the service or product itself. The Tennessee Court of Appeals's decision in *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351 (Tenn. Ct. App. 2001) is instructive on this point. There, plaintiff purchased a Chevrolet van from a dealership that required him to agree to arbitrate all claims arising from the sale or financing of the van. *Id*. at 354. When plaintiff later sued over what he believed to be a fraudulent interest rate, the trial court rejected his argument that the arbitration agreement was adhesive and compelled arbitration. *Id*. at 353. The court of appeals affirmed. In relevant part, the court observed that if plaintiff had objected to the arbitration agreement and the dealership "had refused to sell Plaintiff the van, Plaintiff could have gone to another Chevrolet dealership (or any other type of dealership for that matter) and obtained a van elsewhere if he considered the Agreement unacceptable." *Id*. at 360. Thus, the desired product in *Pyburn* was not a Chevrolet van or a van with a certain mileage or a van being offered at a certain price. It was a van. Similarly, the desired product here is not a bank account with a certain interest rate or certain privileges. It is a bank account.

Once the desired product is properly defined, the answer to the next question is obvious: could plaintiffs have obtained a bank account elsewhere without acquiescing to Branch Banking's arbitration agreement? Of course. According to plaintiffs' own expert, they could have obtained a bank account in Sevier County without having to agree to arbitration *at all*. Plaintiffs' expert testified that in 2001 (the year of the first arbitration amendment) "none of [the six principal banks doing business in Sevier County] were utilizing provisions in account agreements that would . . . require disputes with the bank to be decided by arbitration." By the time that plaintiffs' bank sent out the second arbitration amendment in 2004, arbitration agreements in Sevier County's banking scene were still "not a common or widespread practice." Even in 2017, only a "few banks in Sevier County may have been utilizing [arbitration agreements]" but arbitration was still not a "common, widespread, or accepted practice by banks in Sevier County."

Each time that plaintiffs were faced with notice of an arbitration agreement, they could have gone to another nearby bank and—according to their expert—received an account that would have preserved their ready access to the courts. Instead, they chose to remain at Branch Banking, with an arbitration agreement and a higher interest rate. Having had ample opportunity to find alternative banking services, plaintiffs cannot now contend that Branch Banking offered the arbitration agreements to them under "such conditions that [they could not have] obtain[ed] the desired product or service except by acquiescing to the [arbitration agreement]." *Buraczynski*, 919 S.W.2d at 320. Accordingly, this arbitration agreement is not adhesive.

B.

But even if the arbitration agreement is adhesive, "[that] does not end [the Court's] inquiry because contracts of adhesion still may be enforceable." *Pyburn*, 63 S.W.3d at 360; *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 688 (Tenn. 1996) ("[N]ot all adhesion contracts are unenforceable."). An adhesive contract's enforceability "generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Buraczynski*, 919 S.W.2d at 320. A contract is unconscionable when the "inequality of the bargain is so manifest as to shock the judgment of a

person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004). "An unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice." *Id.* Again, plaintiffs bear the burden of showing unconscionability. *See Green Tree*, 531 U.S. at 91.

Plaintiffs argue that this arbitration provision is beyond the reasonable expectations of an ordinary Sevier County resident because few, if any, other banks in the county require arbitration. I see no reason why this reasonableness determination should be limited to the county level. Doing so would effectively exempt the residents of one Tennessee county from the national and state-wide policies favoring the enforcement of arbitration agreements. *See Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *Buraczynski*, 919 S.W.2d at 319. Moreover, by the time that Branch Banking first introduced arbitration agreements to plaintiffs, Tennessee courts had enforced arbitration clauses across the spectrum of consumer goods and services, including in healthcare contracts, *Buraczynski*, 919 S.W.2d at 321, car purchase agreements, *Pyburn*, 63 S.W.3d at 362, and consumer loan agreements, *Berkley v. H&R Block E. Tax Servs., Inc.*, 30 S.W.3d 341, 344 (Tenn. Ct. App. 2001). The Tennessee Supreme Court also acknowledged that, at least as of 2017, "account agreements that contain predispute arbitration agreements [were] ubiquitous among financial services institutions." *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 263 (Tenn. 2017). Simply put, by the time that plaintiffs assented to the operative agreement here, arbitration—particularly arbitration with your bank—was the rule, not the exception.

And the terms of this particular arbitration agreement are neither oppressive nor unconscionable. The 2017 arbitration agreement appeared on the first page of the bank services agreement, under the bold, capitalized heading "**ARBITRATION AGREEMENT**." Before describing the substance of the agreement, there was an additional capitalized warning:

IT IS IMPORTANT THAT YOU READ THIS ARBITRATION PROVISION CAREFULLY.  IT PROVIDES THAT YOU MAY BE REQUIRED TO SETTLE A CLAIM OR DISPUTE THROUGH ARBITRATION, EVEN IF YOU PREFER TO LITIGATE SUCH CLAIMS IN COURT.  YOU ARE WAIVING RIGHTS YOU MAY HAVE TO LITIGATE THE CLAIMS IN A COURT OR BEFORE A JURY.  YOU ARE WAIVING YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT, CLASS ACTION ARBITRATION, OR OTHER REPRESENTATIVE ACTION WITH RESPECT TO SUCH CLAIMS.

The banking services agreement then described, in detail, the terms of the arbitration agreement.

Tennessee courts look to eleven factors when considering whether an adhesive arbitration agreement is unconscionable: (1) whether the arbitration agreement is "hidden" in another document; (2) whether the agreement "clearly indicates that by agreeing to arbitration, [plaintiff] is waiving her right to a jury trial," (3) whether anything suggests that plaintiff was "not provided with an opportunity to question the terms of the agreement;" (4) whether plaintiff was aware of other service providers, (5) whether the agreement offers notice "as to the procedure and effect of arbitration" including "the procedure for seeking arbitration, how an arbitrator will be appointed, the binding effect of arbitration, or any of the procedure to be utilized during the arbitration proceedings," (6) whether plaintiff was required to sign the agreement "in an expedient manner," (7) whether the agreement was offered on a "take it or leave it" basis, (8) whether there was "comparatively unequal bargaining power" due to plaintiff's "relative lack of knowledge" of the industry, (9) whether the arbitration agreement provided a method for revocation, (10) whether arbitration agreements are "particularly common" in the industry, and (11) whether the agreement requires both sides to submit claims to arbitration.  *See Wofford v. M.J. Edwards & Sons Funeral Home, Inc.*, 490 S.W.3d 800, 822–24 (Tenn. Ct. App. 2015).

Nearly all of the *Wofford* factors weigh against finding unconscionability.  Branch Banking put the arbitration agreement front-and-center in the bank services agreement and drew special attention to it with bold letters and a capitalized warning.  Although the agreement was included in another document, it cannot reasonably be described as hidden.  Even the most casual reader can scan their eyes halfway down the first page of a document that governs their banking relationship.  The all-caps warning clearly indicates plaintiffs' waiver of a jury trial.

There is no indication that plaintiffs were not provided with an opportunity to question the terms of the agreement or were forced to agree in an expedient manner. And Plaintiffs were surely aware of other banks to which they could take their business.

The 2017 agreement also offered notice of the arbitration's procedure by stating that "[t]he arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules & Procedures." Although Branch Banking did not specifically articulate these procedures in the agreement, it notified the recipient that "[y]ou may obtain a copy of the rules of the arbitration administrator, including information about consumer arbitration, fees, and instructions for initiation arbitration by contacting JAMS at www.jamsadr.com. Phone: 800-352-5267." And the agreement also required Branch Banking to submit any claims against plaintiffs to arbitration.

Moreover, the Tennessee Supreme Court has acknowledged, at least by the time of the 2017 agreement, "account agreements that contain predispute arbitration agreements [were] ubiquitous among financial services institutions." *Cumberland Trust*, 532 S.W.3d at 263. This is particularly important because "terms that are common in the industry are generally not unconscionable." *Wofford*, 490 S.W.3d at 819 (citation omitted).

Beyond the *Wofford* factors, the "costs to initiate or pursue arbitration" is a "factor to be considered in determining whether the agreement to arbitrate is enforceable." *Hill v. NHC Healthcare/Nashville*, *LLC*, No. M2005-01818-COA-R3-CV, 2008 WL 1901198, at *16 (Apr. 30, 2008). But "the party seeking to invalidate an arbitration agreement on the ground that the costs are too great has the burden of proving such costs." *Id.* (citing *Pyburn*, 63 S.W.3d at 363); *see also Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 659–60 (6th Cir. 2003) ("[T]he burden of demonstrating that incurring [large arbitration costs and fees that would deter litigants from seeking to vindicate their rights in the arbitral forum] is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.") A plaintiff may satisfy this burden by, for example, submitting the "rules and fee schedules" of the possible arbitrators contemplated by the agreement. *Hill*, 2008 WL 1901198, at *16 ("The proof shows that the likely costs to simply initiate arbitration under the agreement are very high, perhaps reaching $18,000.")

Here, plaintiffs have not offered any proof regarding the cost of arbitration. Although the arbitration agreement discusses possible cost allocation, there is no evidence in the record regarding the financial burden that a plaintiff would likely bear to arbitrate a claim. Thus, plaintiffs have not shown that arbitration costs are prohibitive, and we have no basis to conclude that the cost to initiate or pursue arbitration renders this agreement unconscionable.

The majority cites *In re Checking Account Overdraft Litig.*, 685 F.3d 1269 (11th Cir. 2012), a case where the Eleventh Circuit struck down a portion of one of Branch Banking's bank services agreements as unconscionable. This decision is not relevant to our current inquiry because it dealt with entirely different contractual language. There, the agreement mandated that the customer would be liable for *all* costs that Branch Banking incurred as a result of any dispute (win or lose) involving the customer's account, and that the bank could deduct these costs from the account without prior notice. *Id*. at 1275. Applying South Carolina law, the Eleventh Circuit found this clause unconscionable because (1) it was buried on page fourteen and separated from the arbitration provision, *id*. at 1279–80, and (2) "the notion that a claimant who prevails can be forced to pay the respondent's expense incurred in attempting to avoid liability for its proven wrongdoing . . . contravenes basic expectations derived from intuitive notions of fairness." *Id*. at 1281 (internal quotation marks and citation omitted).

We do not have comparable terms here. The operative arbitration agreement provides that "[t]he arbitrator may, in its award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party." This clause appears on the first page of the bank services agreement, under the bold, capitalized header "**ARBITRATION AGREEMENT**" and under an all-caps warning that "YOU SHOULD READ THIS ARBITRATION PROVISION CAREFULLY." Consistent with this clause, Tennessee allows parties to authorize the arbitrator to allocate costs in its award. Tenn. Code Ann. § 29-5-311. Moreover, the arbitrator is not compelled to award costs and fees at all, as shown by the agreement's use of the permissive "may." The Branch Banking agreement currently before us is a far cry from the one that the Eleventh Circuit found unconscionable in *In re Checking Account*.

We should not second-guess the precise balance struck by the parties, and instead must limit our review to determining unconscionability.  Because this arbitration agreement does not "shock the judgment of a person of common sense," or possess terms that are "so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other," or have provisions that are "so one-sided" that plaintiffs were denied "any opportunity for meaningful choice," it is not unconscionable under Tennessee law.

Pursuant to the parties' valid agreement, this case should proceed to arbitration.

III.

For these reasons, I respectfully dissent.