[Cite as *Rudolph v. Wright Patt Credit Union*, 2021-Ohio-2215.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | | |
|---|---|---|
| VINCENT RUDOLPH | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2020-CA-50 |
| | : | |
| v. | : | Trial Court Case No. 2020-CV-241 |
| | : | |
| WRIGHT PATT CREDIT UNION | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 30th day of June, 2021.

. . . . . . . . . . .

ROBB S. STOKAR, Atty. Reg. No. 0091330, 2712 Observatory Avenue, Cincinnati, Ohio 45208
    Attorney for Plaintiff-Appellant

DANIEL C. GIBSON, Atty. Reg. No. 0080129, 100 South Third Street, Columbus, Ohio 43215
and
JAMES R. BRANIT, pro hac vice, 303 West Madison Street, Suite 300, Chicago, Illinois 60606
    Attorneys for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Plaintiff-Appellant, Vincent Rudolph, appeals from a judgment ordering the case to arbitration. According to Rudolph, the trial court erred in ordering arbitration because he and Defendant-Appellee, Wright Patt Credit Union, Inc. ("WPCU"), never entered into an agreement to arbitrate, and WPCU was not permitted to add arbitration provisions to its existing membership agreements. In addition, Rudolph contends that he did not have actual or constructive notice of any modifications. Rudolph further argues that a February 2019 membership agreement contained only a stray reference to a non-existent dispute resolution section, which rendered it vague and unenforceable. And finally, Rudolph contends that an arbitration provision in a July 2019 membership agreement was both procedurally and substantively unconscionable.

**{¶ 2}** We disagree, and we find no error by the trial court. When Rudolph entered into the original membership agreement with WPCU, he agreed to comply with any amendments to the WPCU membership agreement and further agreed that WPCU could change the terms of the agreement and other account documents at any time. Rudolph also accepted the arbitration terms by continuing his membership in WPCU. Furthermore, Rudolph had notice of changes to the agreement, as they were posted on WPCU's website, which Rudolph accessed. And finally, the arbitration provisions were neither vague nor unconscionable. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 3}** WPCU is a not-for-profit cooperative and financial institution which provides its members with account and loan services. WPCU's assets are owned by its members,

who democratically control it.   WPCU Motion to Dismiss or in the Alternative, Application for Stay Pending Arbitration ("Motion to Dismiss") (Aug. 10, 2020), and attached Affidavit of Kim Riley, ¶ 2.

{¶ 4} In August 2017, Rudolph became a WPCU member.   Affidavit of Vincent Rudolph ¶ 3.   At the time, Rudolph's account was governed by the 2015 WPCU Membership and Account Agreement.   Affidavit of Christian A. Jenkins, ¶ 5; Ex. B attached to the Jenkins' Affidavit; and WPCU000224.[1]   The Agreement noted that it was a legally binding document.   *Id.*   In addition, the Agreement stated that:

> Your account type(s) and ownership features are designated on your Account Card.   By signing an Account Card, each of you, jointly and severally, agree to the terms and conditions in this Agreement and Account Card, which includes the Electronic Fund Transfers Disclosure, the Funds Availability Policy Disclosure, the Truth-in-Savings Disclosure, the General Fee Schedule, the Rate Sheet, and any account Receipt accompanying this Agreement (collectively known as the "Account Documents").   Additionally, *you agree to comply with* the Credit Union's Articles of Incorporation and Code of Regulations and membership conditions (collectively known as the "Articles") and *any amendments to the Articles and Account Documents.*

(Emphasis added.)   *Id.*

{¶ 5} The 2015 agreement contained 25 sections outlining various matters such as account ownership, deposit requirements, overdrafts, and so forth.   Section 15 was

---

[1] For ease of reading, we will refer to the pages of the various membership agreements by the WPCU designation, followed by page numbers as noted in the main text, i.e., "WPCU000224."

entitled "Notices" and stated, in pertinent part, as follows:

(b) **Notice of Amendments**.   Except as prohibited by applicable law, we may change the terms of this Agreement and the other Account Documents at any time.   We will notify you of any changes in terms, rates, or fees as required by law.   We reserve the right to waive any term in this Agreement. Any such waiver shall not affect our right to future enforcement.

(c) **Effect of Notice**.   Any written notice you give us is effective when we receive it.   Any written notice we give to you is effective when it is deposited in the U.S. Mail, postage prepaid and addressed to you at your statement mailing address.   Notice to any account owner is considered notice to all account owners.

(Emphasis sic.)   WPCU000230, Section 15(b) and (c).

{¶ 6} The 2015 membership agreement did not contain any arbitration provisions. Instead, it stated that "[a]ny action to enforce this Agreement shall be commenced in the Common Pleas Court of Greene County, Ohio."   WPCU000232, Section 25.

{¶ 7} In addition to the membership provisions, the 2015 agreement also contained a section called "Electronic Fund Transfers Disclosure," which outlined a member's rights and responsibilities.   *Id.* at WPCU000232-000233.   This section discussed debit cards, told members how to access their accounts electronically by using WPCU's Online Internet Account Service ("WPCU On-Line"), and provided information about reporting errors.   WPCU000233 at Section 5, and WPCU000234, Sections 7 and 10.   Also included was a statement that "Your designated account may also be governed by other agreements between you and us and by our rules and regulations for your designated

account." WPCU000236, Section 14.

{¶ 8} Effective in January 2018, WPCU amended the membership agreement. Jenkins' Affidavit, Ex. C, WPCU000001-000021. This amended agreement stated that "By opening or maintaining your Credit Union account on or after the effective date of this Agreement, you agree that the terms and conditions contained in this Agreement will govern your account and any services related to your account." WPCU000002. WPCU changed how the sections were organized and numbered and also added an arbitration provision. Specifically, the January 2018 agreement stated:

3. Reporting Errors and Dispute Resolution

\* \* \*

If you have a dispute with the Credit Union and we are not able to resolve the dispute informally, you agree that the dispute will be resolved through an arbitration process further detailed in the Dispute Resolution section of the Account Agreement. If a claim is eligible to be resolved in small claims court, you may pursue the claim in small claims court.

WPCU000007, Section 3. However, the agreement did not contain a Dispute Resolution section.

{¶ 9} WPCU did not mail or email the January 2018 agreement to its members. Instead, WPCU communicated with its members as a whole by posting documents on its website. WPCU's continuous practice has been to maintain current copies of its Membership Agreement and Account Documents on its website. If members request copies of agreements by calling WPCU or inquiring at a branch, WPCU will mail or email the documents to them. Jenkins' Affidavit, Ex. E (Deposition Excerpts of Kimberly Riley),

p. 72. 120, 141, and 143; Motion to Dismiss, Riley Affidavit at ¶ 14.

{¶ 10} On December 4, 2018, Rudolph registered for online banking. In order to do so, he had to consent to the terms of WPCU's online banking agreement. Riley Affidavit at ¶ 13 and 15, and Ex. 3 attached to the Riley Affidavit. Under the terms of the online banking agreement, Rudolph agreed " 'to electronically view any changes in disclosures, election information, or updates to WPCU products, services, and fees.' " *Id.* at ¶ 14; Ex. 2 attached to the Riley Affidavit (WPCU 000170 – the WPCU Internet Account Access Agreement, Optional Bill Pay Agreement and Disclosure Statement dated July 27, 2017).

{¶ 11} WPCU again amended its member agreement in February 2019. Section 3 remained the same, requiring arbitration according to the agreement's Dispute Resolution section. Jenkins' Affidavit, Ex. D, WPCU000028. Again, however, the agreement did not contain a separate Dispute Resolution section.

{¶ 12} In 2019, WPCU issued two versions of the membership agreement. They are identical other than an irrelevant part dealing with how WPCU handles personal information. Riley Affidavit at ¶ 5 and Ex. 1 attached to the Affidavit. Version 1 was posted on the website on July 31, 2019, and Version 2 was posted in October 2019. Riley Affidavit at ¶ 8.

{¶ 13} These versions added additional information about arbitration. Again, the agreement stated that "By opening or maintaining your Credit Union account on or after the effective date of this Agreement, you agree that the terms and conditions contained in this agreement will govern your account and any services related to your account."

Ex. 1 attached to the Riley Affidavit, WPCU000093 (Version 1).[2]

{¶ 14} Concerning arbitration, the 2019 agreement again required arbitration, but added that the process was "further detailed in Section 8.25 Dispute Resolution and Exhaustion of Administrative Remedies below."   WPCU000098, Section 3.   This section stated as follows:

8.25   Dispute Resolution and Exhaustion of Administrative Remedies

You understand and agree as a member of the Credit Union that member service and satisfaction is our primary objective.   The Credit Union would not exist without its member/owners.   A fundamental principle of member services and satisfaction is to resolve all disputes with our members in a friendly and non-adversarial basis.   Therefore, the procedures outlined in this Section are critically important to our overall mission of member services and satisfaction.

Before you are permitted to proceed with a claim against the Credit Union as outlined in Section 8.23 above, you must request resolution of your claim in writing to the Credit Union by mandatory binding arbitration as outlined in this Section.   You must send your request to the Credit Union by certified U.S. Mail to, "Wright-Patt Credit Union, Inc., c/o Legal Department, 3560 Pentagon Blvd., Beavercreek, OH 45431-1706.   Your request must conspicuously state, "REQUEST FOR ARBITRATION" near the top of the document, and include your contact information, account number, and

---

[2] Our references will be to Version 1, since the versions are virtually identical.   Ex. 1 is also the same document as Ex. F attached to the Affidavit of Christian A. Jenkins.   *See* Jenkins' Affidavit.

nature of your claim(s). The Credit Union shall have thirty (30) days after receipt of your request to do any of the following: (1) request an in person meeting with you to discuss your claims at our Corporate Headquarters or other mutually agreeable location at our cost; (2) waive the right to mandatory arbitration; or (3) agree to mandatory arbitration. If we elect to meet with you in person and you are still not satisfied with the outcome of the meeting then the Credit Union shall have thirty (30) days after the meeting to notify you in writing of its decision regarding arbitration as outlined in options (2) and (3) above. Further, you agree to resolve your claim(s) with the Credit Union on an individual basis, and not participate in a class action proceeding.

If the Credit Union waives the right to arbitration then you may proceed with your claim as stated in Section 8.23 above. If the Credit Union agrees to arbitration then the following provisions apply. All claims and disputes arising under or relating to the Agreement are to be settled by binding arbitration in the state of Ohio. The arbitration shall be conducted on a confidential basis pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any decision or award as a result of any such arbitration proceeding shall be in writing and shall provide an explanation for all conclusions of law and fact and shall include the assessment of costs, expenses, and reasonable attorneys' fees. Consistent with said rules of the American Arbitration Association, the prevailing party may request reimbursement of its reasonable attorneys'

fees for conducting the arbitration. Further, you agree to split the costs of the arbitration with the Credit Union regardless of the outcome of the arbitration. Any such arbitration shall be conducted by an arbitrator experienced in banking and shall include a written report of the arbitration hearing. The parties reserve the right to object to any individual who is employed by or affiliated with a competing organization or entity. An award of arbitration may be confirmed by the Common Pleas Court of Greene County, Ohio.

(Emphasis sic.) WPCU000111.

{¶ 15} On March 25, 2020, Rudolph filed a class action complaint against WPCU in Greene County Common Pleas Court. The complaint sought money damages and declaratory relief from WPCU based on its alleged unfair collection of overdraft fees that were not actually withdrawn as alleged below. Class Action Complaint, ¶ 1. Essentially, the challenged practice was outlined as follows:

19. * * * At the moment a debit card transaction is authorized on an account with a sufficient positive balance to cover the debit transaction, WPCU immediately reduces the consumer's checking account for the amount of the debit purchase, sets aside funds in the checking account to cover that transaction, and as a result, the consumer's displayed balance is immediately adjusted to reflect that subtracted amount. As a result, when such debit transactions are approved, customers' accounts necessarily have (and will always have) sufficient available funds available to cover these transactions because WPCU has already sequestered these funds

for payment.

20. However, WPCU still assesses harsh $19 OD Fees on many of these transactions and misrepresents its practices in account documents.

21. Despite putting aside sufficient available funds for debit card transactions at the time the transactions are authorized, WPCU later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These are APPSN [Authorize Positive, Purportedly Settle Negative] Transactions.

22. WPCU maintains a running account balance in real-time, tracking funds consumers have for immediate use. This running account balance is adjusted in real- time to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, WPCU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder, and such funds are specifically associated with a given debit card transaction.

23. That means when any *subsequent* intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit transactions. This means that subsequent transactions may properly incur OD Fees due to the availability of the funds sequestered for debit card transactions.

24. Despite segregating and holding debit card funds off-limits to cover other transactions, WPCU improperly charges OD Fees on these APPSN transactions, although the APPSN transactions **always** have available funds to be covered.

(Emphasis sic.) Complaint at p. 4-5, ¶ 19-24.

{¶ 16} According to the Complaint, WPCU had no justification for these practices, other than to maximize revenue. *Id.* at p. 6, ¶ 26. As an example, Rudolph cited only one transaction from his account – a transaction that occurred on August 24, 2019, when WPCU assessed an overdraft fee of $19 for a debit card transaction that occurred on August 23, 2019. Allegedly, the account had a positive balance when the transaction was authorized, but did not have a positive balance the following day, when the debit was to be paid. *Id.* at p. 12-13, ¶ 64. As Exhibit A to the Complaint, Rudolph attached the February 2019 Account Agreement, which, as noted, called for arbitration but did not contain the "Dispute Resolution" section that had been mentioned in Section 3 of the Agreement.

{¶ 17} On August 6, 2020, the magistrate filed an order extending WPCU's pleading deadline and also setting an arbitration discovery and briefing schedule. WPCU then filed a motion to dismiss, or alternatively for a stay pending arbitration. *See* Motion to Dismiss. On October 30, 2020, Rudolph filed a response opposing the motion to dismiss, and WPCU filed its reply on November 23, 2020.

{¶ 18} Subsequently, the trial court filed a decision and entry staying the matter until arbitration concluded. Decision & Entry (Dec. 14, 2020). Rudolph timely appealed from the trial court's order.

## II.   Alleged Error in Ordering Arbitration

**{¶ 19}** In a sole assignment of error, Rudolph states:

> The Trial Court Erred by Granting WPCU's Motion to Compel Arbitration.   *See* Decision and Entry on Motion to Dismiss, or in the Alternative, Application to Stay Pending Arbitration.

### A.   Addition of Arbitration Agreement

**{¶ 20}** Rudolph makes several main points, which we will discuss out of order. The first issue involves the trial court's alleged error in finding that Rudolph had agreed to the arbitration provision in the February 2019 Agreement because Rudolph attached the agreement to the complaint.   Rudolph argues that he attached this agreement to the complaint only to show that a contract existed; he did not, thereby, admit that the provision was valid or that he agreed to arbitrate.

**{¶ 21}** In our opinion, this argument is somewhat of a red herring, as the trial court did not say that Rudolph had agreed to arbitrate because he attached the document to the complaint.   Instead, the court's decision said only that "One 'account document' that Rudolph alleges was breached is the Important Account Information effective in February, 2019."   Decision & Entry, p. 2.   The court then reviewed the arbitration provision in that particular agreement, holding it was clear and should be enforced.   *Id.*

**{¶ 22}** Turning to more substantive matters, we have applied an abuse of discretion standard in reviewing trial court decisions ruling on motions to stay the proceedings pending arbitration.   *John A. Becker Co. v. Jedson Eng., Inc.*, 2018-Ohio-

3924, 121 N.E.3d 788, ¶ 11 (2d Dist.).[3]  An abuse of discretion means "an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).  "A decision is unreasonable if there is no sound reasoning process that would support that decision.   It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.  Accord Brown v. Burnett*, 2020-Ohio-297, 144 N.E.3d 475, ¶ 21 (2d Dist.).   The issue here, therefore, is whether the trial court's decision was supported by sound reasoning.

{¶ 23} "Both the Ohio General Assembly and Ohio courts have expressed a strong public policy favoring arbitration."  *Hayes v. Oakridge Home*, 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408, ¶ 15, citing R.C. Chapter 2711 and *Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 27.   (Other citation omitted).   The reasons for this policy include giving parties an economical and relatively quick means of resolving disputes as well as easing the burden on court dockets.   *Id.*   As a result, courts should resolve all doubt in favor of arbitration.   *Id.*

{¶ 24} R.C. 2711.02 permits courts to order arbitration.   Under R.C. 2711.02(B):

If any action is brought upon any issue referable to arbitration under

an agreement in writing for arbitration, the court in which the action is

---

[3] Courts have held, however, that legal issues, like contract interpretation, should be reviewed de novo.  *E.g. Alford v. Arbors at Gallipolis*, 2018-Ohio-4653, 123 N.E.3d 305, ¶ 9 (4th Dist.). This makes sense, because the Supreme Court of Ohio has said that "the proper standard of review of a determination whether an arbitration agreement is enforceable in light of a claim of unconscionability is de novo, but any factual findings of the trial court must be accorded appropriate deference."  *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 2.

pending, upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration, shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement, provided the applicant for the stay is not in default in proceeding with arbitration.

{¶ 25} "When a party requests a stay under the statute, the first issue before the trial court is whether there is a valid written agreement to arbitrate." *Reedy v. Cincinnati Bengals, Inc.*, 143 Ohio App.3d 516, 520, 758 N.E.2d 678 (1st Dist.2001). "Whether the parties have executed a valid written arbitration agreement is a matter of state contract law. 'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Westerfield v. Three Rivers Nursing & Rehab. Ctr., L.L.C.*, 2d Dist. Montgomery No. 25347, 2013-Ohio-512, ¶ 20, quoting *Minster Farmers Coop. Exchange Co., Inc. v. Meyer*, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 28. (Other citation omitted.)

{¶ 26} Based on our review, the trial court did not err in concluding that Rudolph agreed to arbitration. First, while the 2015 agreement lacked an arbitration clause, Rudolph did agree that "[e]xcept as prohibited by applicable law," WPCU could "change the terms of this Agreement and the other Account Documents at any time." WPCU000230, at Section 15(b). According to Rudolph, however, adding an arbitration provision would not be a permissible change because it was not contemplated by the original agreement and WPCU could not establish a meeting of the minds concerning

such a new term. In this context, Rudolph focuses on the statement following the first part of Section 15(b), i.e., that WPCU would notify Rudolph of "any changes in terms, rates, or fees as required by law." *Id.* To Rudolph, a "new" term is not a "change" in terms.

**{¶ 27}** In support of his theory, Rudolph cites *Maestle v. Best Buy Co.*, 8th Dist. Cuyahoga No. 79827, 2005-Ohio-4120. In that case, the plaintiffs obtained Best Buy card accounts with Bank One. *Id.* at ¶ 2. Two years later, Bank One contributed its portfolio to a joint venture with General Electric ("G.E."). *Id.* G.E. then sent all Best Buy credit card holders a notice of a change in terms, among which was a comprehensive arbitration clause. *Id.* Subsequently, the plaintiffs brought a class action against Bank One and Best Buy, challenging finance and interest charges. *Id.* at ¶ 3. In responding, these defendants claimed they were third-party beneficiaries of the G.E. arbitration provision and asked the court to order arbitration. *Id.* at ¶ 4.

**{¶ 28}** After the trial court denied the defendants' request to stay the proceedings pending arbitration, they appealed. *Id.* at ¶ 4-5. On appeal, the defendants argued that "an arbitration clause may be unilaterally added to a cardholder agreement through the change-in-terms provision so long as they follow the proper procedure." *Id.* at ¶ 14. However, the court of appeals disagreed.

**{¶ 29}** Initially, the court noted that Ohio had not ruled on this specific issue and that other jurisdictions had reached conflicting conclusions. *Id.* at ¶ 15. Some cases relied on statutes authorizing credit-card companies to make unilateral changes, some allowed amendments without statutory authorization, and some refused to permit addition of arbitration clauses. *Id.* The court then considered two cases, one of which enforced

an arbitration agreement that had been added, finding it was not procedurally unconscionable. *Id.* at ¶ 16, discussing *Bank One, N.A. v. Coates*, 125 F.Supp.2d 819 (S.D.Miss.2001). The second case, *Badie v. Bank of America*, 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273 (Cal.App.1998), focused instead on ordinary contract principles and held that "the arbitration clause was not binding because it was not the type of change contemplated by the parties when they signed the original contract." *Id.* at ¶ 17-18. The Eighth District Court of Appeals declined to follow *Coates* and followed the contractual interpretation in *Badie* instead. *Id.* at ¶ 19-23.

{¶ 30} The original contractual provision in *Maestle* stated that:

"Amendment: We may change or amend the terms of this Agreement upon fifteen (15) days prior written notice if required by law. Any change of amended fee, charge, interest rate, FINANCE CHARGE, ANNUAL PERCENTAGE RATE, or minimum payment amount, whether increased or decreased, may be effective to both the outstanding Account Balance and future transactions."

*Maestle*, 8th Dist. Cuyahoga No. 79827, 2005-Ohio-4120, at ¶ 27.

{¶ 31} After reviewing this clause, the court concluded that "Appellees could not anticipate that appellants, let alone a new third party, would amend the agreement to add an arbitration clause, since the amendment provision referenced only changes to payments, charges, fees and interest." *Id.* at ¶ 28. In contrast to *Maestle*, however, the change provision in WPCU's 2015 Agreement was not so limited and did not refer to any specific types of changes.

{¶ 32} A federal district court has read *Maestle* "as imposing substantive limitations

on the type of terms that may be added or amended pursuant to a change-of-terms provision in a cardholder agreement." *Follman v. World Fin. Network Natl. Bank*, 721 F.Supp.2d 158, 164 (E.D. N.Y. 2010). Nonetheless, *Follman* rejected a requirement that the contract must allow the bank to add, rather than "change" terms. The court stressed that "the issue is not whether defendant may add new terms, but whether the terms added are the types of terms the contract contemplated defendant could add." *Id*. at 165.

{¶ 33} Applying that framing of the issue, *Maestle* noted that the cardholder would not have anticipated the addition of arbitration because "nowhere in the contract is there a clause addressing forums of dispute." *Maestle* at ¶ 28. In contrast, the 2015 Agreement between WPCU and Rudolph contained a section specifying where disputes were to be filed. WPCU000232 at Section 25. Rudolph, therefore, could have anticipated that WPCU might later change the agreement to add a different avenue of dispute resolution.

{¶ 34} Furthermore, *Maestle* involved a credit card agreement, while the case before us involves a deposit account. In this regard, R.C. 1109.05(B) states that:

> At the time of opening a deposit account, a bank shall provide the depositor a statement containing the existing terms and conditions of the deposit contract. The statement may be set forth on the depositor's signature card, which card may be electronic or in writing. Before effecting *any* change in the terms and conditions of a deposit contract, a bank shall provide notice, in written or electronic form, of the change to each depositor with whom the bank has a deposit contract of the kind to be changed. Depositors and any other owners of interests in deposit accounts *shall be*

*bound by all* changes banks make in their deposit contracts.

(Emphasis added.)

{¶ 35} This statute is broad, referring to "any" and "all" changes. In contrast, the statute in *Maestle,* R.C. 1109.20(D), only states that banks and borrowers "may specify in their agreement any terms and conditions for modifying or amending the agreement." R.C. 1109.20(D) also does not state that borrowers shall be bound by the changes a bank makes. Accordingly, WPCU was able to amend the terms in the 2015 agreement and change the prior method of dispute resolution to arbitration.

{¶ 36} In arguing that the change in terms from the original contract was impermissible, Rudolph has also directed us to the recent decision of the Sixth Circuit Court of Appeals in *Sevier Cty. Schools Fed. Credit Union v. Branch Banking & Tr. Co.,* 990 F.3d 470 (6th Cir.2021). In *Sevier,* the plaintiffs opened money market accounts in 1989 under an agreement with First National Bank ("FNB"), which guaranteed the interest rate would never fall below 6.5%. *Id.* at 473. The original agreement was only two pages long and contained a provision that FNB may change the terms in the agreement from time to time. *Id.*

{¶ 37} In 1997, FNB merged with another bank, which then merged with Branch Banking & Trust Company ("BB&T") in 2001. *Id.* After the merger, BB&T sent out a Bank Services Agreement ("BSA") which included an arbitration provision and also stated that "continued use of an account after receipt of notice constituted acceptance of the amendment." *Id.* The agreement was amended in 2004 and in 2017, with the latter amendment containing "massive changes" to the BSA, including the arbitration requirements. *Id.* at 373-374. However, BB&T continued to pay the 6.5% interest from

2001 until January 2018, when it told the account holders that the rate would be lowered to 1.05% and would later be adjusted to standard balance tiers reflecting the industry's current rate. *Id.* at 474-475.

{¶ 38} After the plaintiffs filed a class action suit, the district court granted BB&T's motion to compel arbitration, and the plaintiffs then appealed. *Id.* at 475. On appeal, the Sixth Circuit reversed, finding that while consideration existed for the changes, mutual assent was lacking. *Id.* at 476. In this regard, the court stated that "[t]he proper question is whether, upon assenting to the original two-page * * * agreement, such individuals and organizations would reasonably expect their relationship to be governed – more than a decade later – by new provisions unilaterally added by a successor bank to such an extent that the BSA ultimately contained terms that materially changed the Plaintiffs' rights and obligations under the original agreement." *Id.* at 478.

{¶ 39} A majority of the panel agreed with the plaintiffs' assertion that "BB&T's discretion under the original change-of-terms provision to amend the terms is not unlimited, but is subject to two requirements: (1) that any changes be reasonable, and (2) that BB&T exercise its discretion to make such changes in a manner consistent with the implied covenant of good faith and fair dealing." *Id.* at 479. After noting that the contract was one of adhesion, the majority found the arbitration change in terms unreasonable "because BB&T provided the Plaintiffs with no opt-out opportunity. This left the Plaintiffs with no choice other than to acquiesce to the new arbitration provision or to close their high-yield savings accounts. And closing their accounts is a totally unreasonable option because doing so would obviate the very essence of the Plaintiffs' accounts – the promise of a perpetual 6.5% annual interest rate." *Id.* at 480. In addition, the majority concluded

that the bank violated the implied covenant of good faith by acting unreasonably "when it added the arbitration provision years after the Plaintiffs' accounts were established by FNB." *Id.*

{¶ 40} Notably, the same circumstances do not exist here. As we indicated, the 2015 agreement, unlike the contract in *Sevier*, did discuss enforcement and dispute resolution, so the change was not completely unanticipated. Furthermore, while WPCU did not offer an option to "opt out" of arbitration, Rudolph could have terminated his account and gone to another bank if he did not like the account terms. He would not have suffered the kind of loss involved in *Sevier*. And finally, the arbitration provision was not added decades after the original contract; it occurred less than three years after Rudolph opened his account. As a result, the decision in *Sevier,* which is not binding on Ohio courts, does not change our conclusion that WPCU could amend the terms in the 2015 Agreement and change the prior method of dispute resolution to arbitration. *E.g., State v. Burnett*, 93 Ohio St.3d 419, 424, 755 N.E.2d 857 (2001) ("state courts need not follow lower federal court decisions").

## B.   Notice

{¶ 41} Rudolph next argues that there was no meeting of the minds concerning the February 2019 and July 2019 Membership Agreements (and hence the arbitration provisions), because he never received copies of the agreements. In response, WPCU contends that it did not have to give members notice of changes to the agreements before they were made. Nonetheless, WPCU contends that Rudolph had actual or constructive notice of the February 2019 and July 2019 agreements because they were posted on the

WPCU website, and Rudolph had agreed to view disclosures online.

{¶ 42} Actual notice is self-explanatory. There is no contention here that Rudolph had actual knowledge of these agreements. *See* Rudolph Affidavit, at ¶ 4; Riley Deposition at p. 72. 140, and 141.

{¶ 43} "Constructive notice has been defined generally as knowledge of 'circumstances which ought to have excited apprehension and inquiry in the mind of a prudent and reasonable man.' " *Weisbrodt v. Edward J. De Bartolo Corp.*, 2d Dist. Montgomery No. 7831, 1983 WL 4890, *5 (Apr.14, 1983), quoting *Varwig v. Railroad Co.*, 54 Ohio St. 455, 468, 44 N.E. 94 (1896). Inquiry notice is similar to constructive notice and again, concerns whether a reasonable person would have been alerted to make inquiry. *E.g., Doyle v. Ohio Co.*, 2d Dist. Clark No. 94-CA-16, 1994 WL 484205, *4 (Sept. 9, 1994).

{¶ 44} None of the agreements required WPCU to give members advance notice of amendments. To the contrary, they all stated that WPCU would give notice "of changes * * * as required by law." WPCU00030 at Section 15(b). Rudolph has not pointed to any law requiring a specific type of notice. We do note that R.C. 1109.05(B) requires "notice in written or electronic form" before changes in the terms and conditions of deposit contracts are made.

{¶ 45} As noted, the 2015 agreement provided that "[a]ny written notice we give to you is effective when it is deposited in the U.S. Mail, postage prepaid and addressed to you at your statement mailing address." WPCU000239 at Section 15(c). This does not require written notice concerning any particular matter, but based on this provision, members might have anticipated receiving written notice of contractual changes.

However, this was not the last provision on the subject.

{¶ 46} As indicated, Rudolph signed up for internet access in December 2018. As part of the Internet Account Access Agreement, Rudolph agreed "TO ELECTRONICALLY VIEW ANY CHANGES IN THE DISCLOSURES, ELECTION INFORMATION, OR UPDATES TO WPCU PRODUCTS, SERVICES, AND FEES." WPCU000170. The Agreement further stated that:

WHEN YOU CANCEL ENROLLMENT IN ONLINE BANKING, WPCU WILL RESUME MAILING ALL OF YOUR CORRESPONDENCE AS ELECTED THROUGH THE U.S. POSTAL SERVICE AT NO ADDITIONAL CHARGE TO YOU. IF YOU WOULD LIKE TO OBTAIN A PAPER COPY OF THE EMAILED CORRESPONDENCE, WPCU WILL PROVIDE IT TO YOU AT NO COST TO YOU. TO RECEIVE ONLINE BANKING SERVICE YOU UNDERSTAND THAT YOU MUST HAVE ACCESS TO THE NECESSARY HARDWARE AND SOFTWARE TO VIEW, PRINT OR OTHERWISE ACCESS NECESSARY INFORMATION.

WPCU000170.

{¶ 47} After reading the above items, reasonable individuals would assume that written notices would no longer be mailed to them, that they would have electronic access to disclosures and updates to WPCU's services, and that they would be expected to view these matters electronically using their own computers.

{¶ 48} After Rudolph agreed to the Internet Account Access Agreement in December 2018, WPCU amended the Membership Agreement a number of times and posted those changes on its website. The online agreement as well as the February

2019 and July 2019 Member Agreements clearly indicate that a member's continued use of the account expresses agreement to the terms and conditions. *See* WPCU000093 ("Acceptance of Terms" in July 2019 Agreement) and WPCU000023 ("Acceptance of Terms" in February 2019 Agreement), which both state that "By opening or maintaining your Credit Union account on or after the effective date of this Agreement, you agree that the terms and conditions contained in this agreement will govern your account and any services related to your account." *See also* WPCU000185, Section 7 (Internet Account Access Agreement), which states that "Your continued use of ONLINE SERVICE constitutes acceptance of all changes to the terms and conditions of this Agreement." Rudolph, therefore, had constructive knowledge of the terms in the February 2019 and July 2019 Membership Agreements.

{¶ 49} Rudolph claims he had no duty to view items posted on WPCU's website. However, we disagree. The law is well-established that parties to contracts are held to have knowledge of the contract. " 'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.' " *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503, 692 N.E.2d 574 (1998), quoting *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L.Ed. 203 (1875). When Rudolph registered for online banking, he had to accept, and did accept, the terms of online banking. Riley Affidavit at ¶ 13-14. With this came the ability and responsibility to review the Member Agreements that WPCU posted on its website.

{¶ 50} According to Rudolph, he also lacked constructive notice because the

agreements were not prominently displayed on the website and he had to click through several links to find them. For example, the July 2019 Membership Agreement was displayed on the website. Riley Deposition at p. 141-142. According to Riley, when an individual logs into the WPCU website, there is a word that says "disclosures" that is a hyperlink. If individuals click on the link, they are taken to a screen which says "Important Account Information." Under that heading, it says "please review these disclosures," and two bullet points follow. Riley Deposition at p. 186-187 and Ex. J, WPCU0255, attached to Jenkins' Affidavit. The bullet points say "General Fee Schedule" and "Important Account Information," which is the July 2019 Membership Agreement. *Id.* at WPCU0255 and Riley Deposition at p. 141.

{¶ 51} Rudolph contends the lack of prominence does not meet the requirements of "browsewrap," which courts have held requires reasonable notice of their existence. In addition, Rudolph argues that very few of the member visits to the website are to view the Membership Agreement; instead, 99.99% of visits are to access accounts.

{¶ 52} As a preliminary point, we do not believe "browsewrap" applies to this situation. The terms "shrinkwrap," "clickwrap," and "browsewrap" refer to situations in which consumers purchase or download products from the internet or obtain or purchase access to internet databases of information. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 429 (2d Cir.2004). During this process, consumers are asked to assent to terms.

{¶ 53} "A shrinkwrap license typically involves (1) notice of a license agreement on product packaging (i.e., the shrinkwrap), (2) presentation of the full license on documents inside the package, and (3) prohibited access to the product without an express indication

of acceptance. Generally, in the shrinkwrap context, the consumer does not manifest assent to the shrinkwrap terms at the time of purchase; instead, the consumer manifests assent to the terms by later actions," like failing to seek a refund within a particular period of time. *Id.* at 428.

{¶ 54} In contrast, "a 'clickwrap' license * * * presents the potential licensee (i.e., the end-user) 'with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon.' * * * Essentially, under a clickwrap arrangement, potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." (Footnote omitted.) *Id.*, quoting *Specht v. Netscape Communications Corp.*, 150 F.Supp.2d 585, 593-94 (S.D.N.Y.2001).

{¶ 55} " '[A] browse wrap license is part of the web site[, *e.g.*, license terms are posted on a site's home page or are accessible by a prominently displayed hyperlink,] and the user assents to the contract when the user visits the web site.' " *Id.*, quoting *Pollstar v. Gigmania Ltd.*, No. CIV-F-00-5671, 2000 WL 33266437 (E.D.Cal. Oct.17, 2000). Furthermore, "a browsewrap agreement * * * may be formed simply by the website visitor's use of the website and does not require any explicit manifestation of assent before * * * using the website." *Traton News, LLC v. Traton Corp.*, 914 F.Supp.2d 901, 910, fn. 10 (S.D. Ohio 2012).[4] Browsewrap agreements are "enforceable against a website visitor who had constructive notice of a website's terms and conditions (usually because they were prominently displayed), and repeatedly accesses that website." *Id.*

---

[4] The term has been spelled as both "browsewrap" and "browse wrap."

at 909.

{¶ 56} If anything, the situation here is more akin to a "clickwrap." In order to access electronic banking, Rudolph had to agree to the terms governing access, which included viewing disclosures and changes in WPCU's services electronically. Furthermore, Rudolph had already agreed that WPCU could unilaterally change its Membership Agreement, and he continued to accept changes and the terms in the agreement by continuing to use his account. However, as we said, we do not really think these concepts apply here, as they seem to be more pertinent to product purchases or licensing.

{¶ 57} "Multiple courts have held that clicking is an acceptable method to manifest assent to the terms of an agreement." (Citations omitted.) *Ranazzi v. Amazon.com, Inc.*, 2015-Ohio-4411, 46 N.E.3d 213, ¶ 12 (6th Dist.). In addition, "courts have upheld such agreements where the disputed terms were contained in a hyperlink. * * * This is so even where the user has failed to actually review the terms of use prior to manifesting assent." (Citations omitted.) *Id*. at ¶ 13. *Accord Campinha-Bacote v. AT&T Corp.*, 10th Dist. Franklin No. 16AP-889, 2017-Ohio-5608, ¶ 13. Finally, even if this case involved a clickwrap or browsewrap situation, our conclusion would not differ, as the terms were sufficiently conspicuous on the website, which Rudolph repeatedly accessed.

{¶ 58} Based on the preceding discussion, we reject Rudolph's argument that he lacked constructive knowledge of the arbitration terms in the February 2019 and July 2019 Membership Agreements.


C.   Arbitration Per the February 2019 Agreement

**{¶ 59}** Rudolph next contends that the trial court erred in finding the "stray" arbitration reference in the February 2019 Agreement enforceable because it referred to a dispute resolution section that did not exist in the document. There is no disagreement about the fact that no such section appeared in this agreement. *See* WPCU000022-000042.

**{¶ 60}** In *Corrpro Cos. Inc. v. Bushman*, 8th Dist. Cuyahoga No. 72432, 1997 WL 565959 (Sept. 11, 1997), the Eighth District Court of Appeals stressed that an " 'enforceable arbitration provision need only show the parties' intent to submit disputes to arbitration. It does not require all the details of the arbitration process. * * * Arbitration clauses do not need to be long or complex; and they are not required to specify the arbitration methods to be employed.' " *Id.* at *1, quoting *K.G. Quick & Assocs., Inc. v. Phil Ross Organizational Seminars, Inc.*, 10th Dist. Franklin No. 89AP-1213, 1990 WL 80646 (June 4, 1990).

**{¶ 61}** According to the Eighth District, "[t]he touchstone of an enforceable arbitration agreement is a clear expression of intent to resolve a dispute through arbitration." *Id.* "In addition, there is no requirement that an arbitration agreement be signed by either party in order to be enforceable. * * * The only requirement is that the arbitration agreement be reduced to writing." (Citation omitted.) *W.K. v. Farrell*, 167 Ohio App.3d 14, 2006-Ohio-2676, 853 N.E.2d 728, ¶ 24 (2d Dist.), citing *Brumm v. McDonald & Co. Secs., Inc.*, 78 Ohio App.3d 96, 102, 603 N.E.2d 1141 (4th Dist.1992).

**{¶ 62}** As indicated above, the February 2019 Membership Agreement unambiguously stated:

> If you have a dispute with the Credit Union and we are not able to

resolve the dispute informally, *you agree that the dispute will be resolved through an arbitration process* further detailed in the Dispute Resolution section of the Account Agreement. If a claim is eligible to be resolved in small claims court, you may pursue the claim in small claims court.

(Emphasis added.) WPCU00028. Based on the wording, there is no doubt that arbitration was intended.

{¶ 63} In finding the February 2019 agreement enforceable, the trial court relied on *Farrell.* In that case, the employment application stated that "If employed by the company, you and the company agree to utilize the company's binding and mandatory alternative dispute resolution program to resolve certain workplace disputes." *Farrell,* 167 Ohio App.3d 14, 2006-Ohio-2676, 853 N.E.2d 728, at ¶ 3. When the plaintiff reported to work, she also signed a document stating that "I hereby agree to utilize the Sterling Resolve Program to pursue any dispute, claim or controversy ('claim') against Sterling." *Id.* at ¶ 5. These statements do not significantly differ from the wording that WPCU used.

{¶ 64} In arguing that the February 2019 agreement is unenforceable, Rudolph contends that it is akin to the one used in *Doe v. Vineyard Columbus*, 10th Dist. Franklin No. 13AP-599, 2014-Ohio-2617. In that case, the application for church membership stated that "In order to accomplish the mission of Vineyard Church of Columbus, I commit myself to the following practices: * * * 3. Committed to Vineyard Columbus' statements, our strategy, our structure and Vineyard's disciplinary and dispute resolution process." *Id.* at ¶ 4. This statement is ambiguous, however. Being committed to a "practice" does not necessarily mean that access to the court system is prohibited.

{¶ 65} Based on the above discussion, we conclude that Rudolph had notice of a clear intent to arbitrate all claims.   And, by continuing to maintain his account, pursuant to the "Acceptance of Terms" provision, and by continuing to use online banking, Rudolph manifested his assent to the arbitration provision.

### D.   Unconscionability

{¶ 66} In his brief, Rudolph notes that the trial court relied strictly on the February 2019 Agreement and did not address the issue of whether the July 2019 Agreement was unconscionable.   Rudolph offers this agreement as an alternative basis for rejecting arbitration, contending the 2019 Agreement was both procedural and substantively unconscionable.   Conversely, WPCU contends the July 2019 agreement was a binding modification to the contract.   WPCU Brief at p. 17.

{¶ 67} "Arbitration agreements are 'valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract.' "   *Taylor Bldg.,* 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 33, quoting R.C. 2711.01(A).   These grounds include unconscionability, which encompasses "both ' "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' "   *Id.* at ¶ 33-34, quoting *Lake Ridge Academy v. Carney,* 66 Ohio St.3d 376, 383, 613 N.E.2d 183 (1993). (Other citation omitted.)   Furthermore, a "party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable."   *Id.* at ¶ 34.

{¶ 68} "[W]hen a party challenges an arbitration provision as unconscionable

pursuant to R.C. 2711.01(A), the party must show that the arbitration clause itself is unconscionable. If the court determines that the arbitration clause is enforceable, claims of unconscionability that relate to the contract generally, rather than the arbitration clause specifically, are properly left to the arbitrator in the first instance." *Id.* at ¶ 42. On review, "a determination whether an arbitration agreement is enforceable in light of a claim of unconscionability is de novo, but any factual findings of the trial court must be accorded appropriate deference." *Id.* at ¶ 2. However, because the trial court in this case did not make any factual findings, our review would be de novo.

### 1. Procedural Unconscionability

**{¶ 69}** In *Taylor Bldg.*, the court stated that:

Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties' " 'age, education, intelligence, business acumen and experience, * * * who drafted the contract, * * * whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question.' " * * * "Factors which may contribute to a finding of unconscionability in the bargaining process [i.e., procedural unconscionability] include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his

interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors." Restatement of the Law 2d, Contracts (1981), Section 208, Comment d. *Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 44.

**{¶ 70}** The primary procedural factors Rudolph advances are that "WPCU is a 'sophisticated financial institution,' " while he "is an ordinary consumer who 'ha[s] difficulty understanding' the 'substantial amount of legalese' in Section 8.25" (the arbitration agreement). Rudolph Brief, p. 21. Rudolph also mentions that WPCU had the ability to unilaterally modify the agreements.

**{¶ 71}** However, "[m]ere inequality of bargaining power is insufficient to invalidate an otherwise enforceable arbitration agreement." *Vanyo v. Clear Channel Worldwide*, 156 Ohio App.3d 706, 2004-Ohio-1793, 808 N.E.2d 482, ¶ 19 (8th Dist.), citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). (Other citation omitted.) *See also Hawkins v. O'Brien*, 2d Dist. Montgomery No. 22490, 2009-Ohio-60, ¶ 24, citing *Gilmer* ("There must be some evidence that, in consequence of the imbalance, the party in the weaker position was defrauded or coerced into agreement to the arbitration clause."). Here, Rudolph made no claim that he was defrauded or coerced.

**{¶ 72}** In terms of unconscionability, "[t]he crucial question is whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print * * *?' " *Lake Ridge Academy*, 66 Ohio St.3d at 383, 613 N.E.2d 183, quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965).

{¶ 73} In this vein, although Rudolph asserts that the arbitration provision in the July 2019 Membership Agreement was procedurally unconscionable because he had difficulty understanding the "legalese," the important terms were not hidden in a maze of fine print, and the language in Section 8.25 of the agreement was straightforward. Specifically, this section said that "Before you are permitted to proceed with a claim against the Credit Union as outlined in Section 8.23 above, you must request resolution of your claim in writing to the Credit Union by mandatory binding arbitration as outlined in this section."

{¶ 74} In discussing procedural unconscionability, *Taylor Bldg.* considered whether the contract was one of adhesion, while noting that "even a contract of adhesion is not in all instances unconscionable per se." *Taylor Bldg.* 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 50.

{¶ 75} An adhesion contract is "a standardized form contract prepared by one party, and offered to the weaker party, usually a consumer, who has no realistic choice as to the contract terms." *Id*., citing Black's Law Dictionary (8th Ed.2004) 342. It is true that Rudolph did not have a choice of terms, but "[c]ontracts between a bank and its customers are generally not considered adhesion contracts, as the parties are considered to have equal bargaining power." *Creative Hardwood Floors, Inc. v. Schafer*, 5th Dist. Fairfield No. 97-CA-56, 1998 WL 515783, *5 (Mar. 24, 1998), citing *Cent. Natl. Bank of Cleveland v. Gallagher*, 13 Ohio App.2d 115, 118, 234 N.E.2d 524 (8th Dist.1968). This is because bank depositors are not generally restricted to dealing with a particular party,

"but may exercise a choice of banks with which to do business." *Gallagher* at 120.[5] Here, Rudolph was not restricted to dealing with WPCU; he could have taken his business to any bank.

**{¶ 76}** In light of the above discussion, we find no evidence of procedural unconscionability. While this finding is fatal to Rudolph's claim, we will briefly consider his arguments about substantive unconscionability. *See Taylor Bldg.* at ¶ 53.

### 2.   Substantive Unconscionability

**{¶ 77}** According to Rudolph, Section 8.25 was substantively unconscionable because: (1) WPCU alone was allowed to decide if a matter would be arbitrated or litigated; (2) arbitration costs were split regardless of the outcome, which was more than he would expend litigating in court; and (3) his financial situation did not let him absorb the cost of an individual arbitration.

**{¶ 78}** Assessing "whether a contract is substantively unconscionable involves consideration of the terms of the agreement and whether they are commercially reasonable." *Hayes,* 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408, at ¶ 33, citing *John R. Davis Trust 8/12/05 v. Beggs*, 10th Dist. Franklin No. 08AP-432, 2008-Ohio-6311, ¶ 13.   (Other citation omitted.)   In deciding whether contracts are substantively unconscionable, courts consider the following factors: "the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability."   *Id*., citing *John R. Davis Trust* at ¶ 13 and *Collins v.*

---

[5] This may not necessarily be true in situations involving banks and issuance of consumer credit agreements, which may have "some aspects of an adhesion contract."   *E.g., Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 472, 700 N.E.2d 859 (1998).

*Click Camera & Video, Inc.*, 86 Ohio App.3d 826, 834, 621 N.E.2d 1294 (2d Dist.1993). However, the Supreme Court of Ohio has not adopted a "bright line set of factors"; instead, "[t]he factors to be considered vary with the content of the agreement at issue." *Id.*

**{¶ 79}** Concerning WPCU's sole ability to decide if a matter would be litigated, "the fact that a contractual provision is one-sided does not render it substantively unconscionable per se." *Hayes* at ¶ 36. As noted in *Taylor Bldg.*, "the obligations of the parties need not be exactly the same if the contract is supported by adequate consideration." *Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 66. Here, adequate consideration existed. Specifically, WPCU not only provided free internet access to accounts, it also offered free mobile banking, free telephone and automated teller access, free bill payment for consumer accounts, and no monthly fee for Total Fair Checking accounts. *See* WPCU000097, Section 2.2; WPCU000175, Section 3; WPCU000190, Schedule I; and Complaint, Ex. B, p. 2.

**{¶ 80}** In his brief, Rudolph has directed our attention to *Post v. ProCare Automotive Serv. Solutions*, 8th Dist. Cuyahoga No. 87646, 2007-Ohio-2106. In *Post*, the court found a similar arbitration substantively unconscionable, because it let the employer bypass arbitration, but limited employees to arbitration. *Id.* at ¶ 17. *Post* involved claims that the employer had discriminated against the employee on the basis of age. *Id.* at ¶ 2.

**{¶ 81}** The employment contract in question contained a clause requiring arbitration, but also said that nothing in the same paragraph "shall be construed so as to deny Employer's right and power to seek and obtain injunctive relief in a court of equity

for any breach or threatened breach of Employee of any of his covenants contained in Paragraph 6." *Id.* at ¶ 4. Notably, the arbitration provision had the effect of depriving the employee of his right under R.C. 4112.99 to sue for punitive damages and to collect attorney fees, which the court stressed "can be a "significant portion of a plaintiff's award." *Id.* at ¶ 13.

{¶ 82} As a result, the majority of the panel stated that it was "not persuaded by ProCare's assertion that this provision, which allows ProCare to use a judicial forum when it is the plaintiff, but limits Anderson to arbitration when he is the plaintiff, is not unconscionable." *Id.* at ¶ 17. Having concluded that the arbitration clause was substantively unconscionable, the court remanded the matter for the trial court to hold a hearing to decide if the arbitration clause was also procedurally unconscionable. *Id.* at ¶ 30.

{¶ 83} As a preliminary point, a substantial difference exists between foregoing a statutory right to collect punitive damages and attorney fees, and the situation here, which involves a civil claim for which attorney fees are not typically available. *E.g., Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, ¶ 7; *Reagans v. MountainHigh Coachworks, Inc.*, 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d 245, ¶ 36.

{¶ 84} Furthermore, we are persuaded by the opinion of Judge Cooney, who concurred in part and dissented in part in *Post*. Judge Cooney agreed with the decision to reverse and remand the case to the trial court, but felt, instead, that arbitration should be ordered. *Post*, 8th Dist. Cuyahoga No. 87646, 2007-Ohio-2106, at ¶ 37 (Cooney, J., concurring in part and dissenting in part). The basis of the dissent was that the arbitration

agreement was not unconscionable. *Id.* at ¶ 58. In dissenting, Judge Cooney first concluded that the plaintiff failed to meet his burden of proving procedural unconscionability. *Id.* at ¶ 41-43. The judge then went on to discuss several aspects of the alleged substantive unconscionability: fee-splitting; attorney fees; waiver of the right to arbitrate; and the employment contract. *Id.* at ¶ 44-58.

{¶ 85} In the context of waiver of the right to arbitrate, Judge Cooney found it significant that:

Merely because the employer need not arbitrate a claim for injunctive or equitable relief involving trade secrets or competition does not make the arbitration agreement unreasonable. *Robbins v. Country Club Ret. Ctr. IV, Inc.*, Belmont App. No. 04BE43, 2005-Ohio-1338. Anderson cites no authority to support his claim that the arbitration clause is unenforceable because it does not cover every type of possible lawsuit.

*Id.* at ¶ 54.

{¶ 86} During her discussion of the employment contract, Judge Cooney also found the nature of the contract important. In this regard, the judge stressed that:

Additionally, this court has held, in the context of employment contracts, when a candidate for employment is free to look elsewhere for employment and is not otherwise forced to consent to the arbitration agreement, the agreement to arbitrate is not unconscionable. * * * Because a candidate for employment is free to seek employment elsewhere and is not obligated to consent to the arbitration agreement, the agreement to arbitrate is not unconscionable.

*Id.* at ¶ 56.

**{¶ 87}** As we mentioned, Rudolph was "free to look elsewhere" for banking services. More significantly, as we also noted, Rudolph failed to meet his burden of proving procedural unconscionability, which was fatal to his claim.

**{¶ 88}** Rudolph's final argument in this regard was that "Section 8.25 is substantively unconscionable because it requires consumers to 'agree to evenly split the costs of the arbitration with the Credit Union *regardless of the outcome of the arbitration.*' " (Emphasis sic.) Rudolph Brief at p. 22. However, "the mere risk that a plaintiff would be forced to pay exorbitant costs is too speculative to justify invalidation of the arbitration agreement." *Taylor Bldg.*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 58. "Without some evidence that a party would be precluded from bringing a claim, the cost of arbitration, standing alone, is not a justifiable reason to find unconscionability." *McCaskey v. Sanford-Brown College*, 8th Dist. Cuyahoga No. 97261, 2012-Ohio-1543, ¶ 34.

**{¶ 89}** In *McCaskey*, the court emphasized that "[t]he *Taylor* court required specific and individualized evidence that arbitration costs were unduly burdensome to the party opposing it." *Id.* at ¶ 32, citing *Taylor Bldg*. *See also Handler v. Southerland Custom Builders, Inc.*, 8th Dist. Cuyahoga No. 86956, 2006-Ohio-4371, ¶ 19 (noting that "because homeowners failed to provide any evidence, other than initial fees, that the cost of arbitration would exceed the cost of litigation, the arbitration clause cannot be said to be substantively unconscionable on the basis of cost").

**{¶ 90}** In *Handler*, the court also commented that:

Although the cost of arbitration may be high, so too is the cost of litigating a

claim. Indeed, it is quite possible that litigation could result in substantial legal fees and costs that, in the end, exceed the cost of arbitration. *See English v. Cornwall Quality Tools Company, Inc.*, Summit App. No. 22578, 2005-Ohio-6983, ¶ 17 (even when plaintiff provided specific estimates as to various costs associated with arbitration, the court held that, in the absence of "evidence of the expected cost differential between arbitration and litigation," the arbitration clause was enforceable).

*Handler* at ¶ 18. Accord *Post*, 8th Dist. Cuyahoga No. 87646, 2007-Ohio-2106, at ¶ 49 (Cooney, J., concurring in part and dissenting in part).

{¶ 91} In the case before us, Rudolph did not submit any evidence of his income or the expected cost differential, beyond a mere statement that filing fees in Greene County Common Pleas Court are $250 versus $876 for initiating commercial arbitration with the American Association Arbitration ("AAA"). Memorandum in Opposition to Motion to Dismiss, p. 16 and fn. 12 and 13.

{¶ 92} WPCU notes in its brief that Rudolph is mistaken in labeling this as commercial arbitration, and that the cost for consumer filing with AAA is only $200. WPCU Brief at p. 24 and fn. 1 and 2. However, this information was not brought to the trial court's attention, and we will not consider it. Nonetheless, there is not a substantial difference in all these amounts, and as *Handler* noted, the cost of litigating cases may well exceed the cost of arbitration. Accordingly, the arbitration agreement is not substantively unconscionable.

{¶ 93} Based on the preceding discussion, Rudolph's sole assignment of error is overruled.

### III. Conclusion

**{¶ 94}** Rudolph's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Robb S. Stokar
Daniel C. Gibson
James R. Branit
Keith Gibson
Jeffrey D. Kaliel
Sophia Gold
Jeffrey Ostrow
Jonathan M. Streisfeld
Daniel Tropin
Hon. Michael A. Buckwalter